531 P.2d 176

**Dorothy Greenberg SPECTOR, Appellant,**

v.

**Albert B. SPECTOR, Appellee.**

**No. 1 CA–CIV 2116.**

Court of Appeals of Arizona,
Division 1,
Department C.

Jan. 30, 1975.

Rehearing Denied March 6, 1975.

Review Denied April 22, 1975.

**134**

Shimmel, Hill, Bishop & Gruender, P. C. by James W. Hill, Robert C. Hackett, Phoenix, for appellant.

Burns, Ferrin & Ehrenreich by F. Britton Burns, Phoenix, for appellee.·

## OPINION

FROEB, Judge.

Dorothy Greenberg and Albert B. Spector were married January 15, 1965. Each had been previously married. At the time of this marriage, Dorothy Greenberg was 45 years old and had moved to Arizona from Ohio, following the death of her first husband. She had a married daughter and four grandchildren. Albert Spector was 49 years old and had lived in Phoenix, Arizona, for many years, pursuing both the practice of law as well as making and managing investments in various properties. He had been divorced from his previous wife by whom he had three children. All of his children were themselves married. After almost seven years of marriage, Dorothy Greenberg and Albert Spector separated and thereafter were divorced on September 17, 1971. The key issues in the case are financial; there is no question on appeal concerning the propriety of the divorce itself.

Appellant Dorothy Greenberg ("Greenberg") contends that (1) the antenuptial agreement between her and appellee Albert B. Spector ("Spector") is invalid and should not be enforced; (2) the trial court erred in not following the findings of the jury; (3) certain property was partially community property of the parties and not wholly the separate property of Spector; and (4) the trial court's order relating to alimony, division of property, and attorneys' fees was inequitable.

The trial of the case began on August 30, 1971, before a jury, and required six days to complete. There were many exhibits. It was vigorously contested. At the conclusion, eleven interrogatories were submitted to and answered by the jury. Thereafter, the court heard and considered objections to proposed findings of fact and conclusions of law, entered its own findings and conclusions on February 4, 1972, and ultimately entered written judgment on March 7, 1972. Greenberg appeals from the court's order dated July 26, 1971, denying her motion for partial summary judgment, from the findings of fact, conclusions of law and judgment of the court entered March 7, 1972, and from the order of the court dated June 20, 1972, overruling objections to form of judgment, findings of fact and conclusions of law and order denying motion for new trial. A cross-appeal filed by Spector was later withdrawn.

## THE ANTENUPTIAL AGREEMENT AND PUBLIC POLICY

Since the antenuptial agreement ("agreement") between the parties was found by the trial court to be a valid, binding and enforceable contract, it was determinative of many of the financial issues in the case. We therefore consider it first.

The agreement is broadly challenged by Greenberg on the ground that it violates public policy of Arizona. We find this contention cannot be sustained.

Arizona Revised Statutes § 25–201, specifically relating to antenuptial contracts, was in effect in Arizona when the agree-

ment was made. The relevant portion, paragraph A, then read:

> "Parties intending to marry may enter into agreements not contrary to good morals or law. They shall not enter into an agreement or make a renunciation the object of which is to alter the law of descent of property either with respect to themselves or inheritance by their children or posterity which either may have by any other person, or with respect to their common children."[1]

Clearly, the first sentence is intended to sanction such agreements so long as they are not contrary to good morals or law, whereas the second sentence imparts a specific restriction against agreements which purport to affect the law of descent of property.

The Arizona Supreme Court has previously had occasion to consider certain issues relating to antenuptial agreements. It has held that an antenuptial agreement which purported to discharge a husband's duty of support following divorce for a sum fixed at $500 was contrary to public policy and void. Williams v. Williams, 29 Ariz. 538, 243 P. 402 (1926). In another case an agreement which purported to alter, by its own terms, statutory provisions concerning descent of property at the death of the marital parties was held to violate A.R.S. § 25–201 and was declared invalid. In re Mackevich's Estate, 93 Ariz. 129, 379 P.2d 119 (1963). The court in these cases however was not called upon to consider the specific issues which are before us in this case, nor is there to be found in them any blanket disapproval of antenuptial agreements from the standpoint of public policy.

In our survey of public policy of the State of Arizona as it pertains to antenuptial contracts, we must consider the Arizona cases and legislative pronouncements both before and after 1965, the year in

which the agreement under review was made.

In a 1966 case the Supreme Court held that a family allowance and probate homestead may be waived by an antenuptial agreement. Smith v. Tang, 100 Ariz. 196, 412 P.2d 697 (1966). Later, in a 1969 case, the Arizona Supreme Court observed that married women today are capable of contracting with their husbands in their own best interest. In re Estate of Harber, 104 Ariz. 79, 449 P.2d 7 (1969). Thirty-two years earlier it had said that either spouse could convey his or her community interest to the other and thus dissolve the community. Estate of Baldwin, 50 Ariz. 265, 71 P.2d 791 (1937). The principle of contractual freedom of the spouses was recognized in Spanish community property law, demonstrating that the roots of modern public policy toward antenuptial agreements reach well back in time.

> "From the earliest inception of the Spanish statutory law governing marital community property, it was permitted to the spouses to contract, agree, or stipulate as between themselves, either before, at the time of or even during marriage, as to the manner in which they wished to share the property earned or gained during the marriage. That is, if they did not wish to be governed by the statutory provisions regulating the division of such earned or gained property, they might elect by virtue of agreement, contract or stipulations to divide it upon some other basis or to allow each spouse to keep as his or her own separate property that which he or she earned or gained during the marriage . . .." de Funiak and Vaughn, Principles of Community Property, § 135 at 333–334, (2d ed. 1971).

In 1973, the Arizona Legislature enacted an extensive revision of the law of marital and domestic relations, sometimes referred to as "no-fault divorce," which recognizes,

---

1. A.R.S. § 25–201, has since been amended. Paragraph A now reads:

> "Parties intending to marry may enter into agreements not contrary to good morals or law."

to a significant extent, the equality of the marriage partners. See A.R.S. § 25–311 et seq. At the same time the statute specifically relating to antenuptial agreements was also amended to allow prospective spouses a wider latitude in their contractual relations. See A.R.S. § 25–201, as amended, Footnote 1, supra. In addition, the Legislature enacted A.R.S. § 14–2204 as part of a new Probate Code effective January 1, 1974, which significantly broadened the right of both spouses to contract with one another concerning their property, both before and after marriage, including their respective rights in and to community property.[2]

Thus, the public policy of Arizona is not violated by the enforcement of an antenuptial agreement involving the present or future property of the prospective spouses, whether that property be community or separate. The institution of marriage is of vital interest to the state and nation since our family and social organization is built upon it. If agreements between spouses provided for or tended to induce divorce or separation, they would be contrary to public policy. But where the prospective marriage partners wish to consider and adjust by legal agreement their respective rights in advance of marriage, we believe that the institution of marriage is thereby strengthened, not weakened. Under such circumstances such agreements are consistent with public policy, not contrary to it. While some courts, perhaps notably Texas, have held to the contrary, we note that even in Texas recent constitutional and statutory changes have validated contractual dealings between present and prospective spouses.[3]

## SPECIFIC PROVISIONS OF THE ANTENUPTIAL AGREEMENT

Paragraphs 1(c), 3(e) and 3(g) of the agreement read:

"1(c) The parties have agreed that only earnings from the practice of law by SPECTOR and only earnings from work by GREENBERG shall be community property.

\* \* \* \* \* \*

"3(e) GREENBERG specifically agrees with SPECTOR that she shall not be entitled to any contributions, either during his lifetime or after his death, arising from the use of community earnings in connection with any payments, including sales price or mortgage payments, relating to the sole and separate property of SPECTOR.

\* \* \* \* \* \*

"3(g) As a specific inducement to marriage, GREENBERG agrees that SPECTOR may use any of his community earnings after marriage to make payments to any creditors which he now has or may have in the future, whether

2. Since this statute is so clearly reflective of present day public policy on the subject of interspousal agreements, it is set out in full:

"§ 14–2204. Waiver of rights of spouse; effect of property settlement

"The rights of a surviving spouse under this title may be waived, wholly or partially, before or after marriage, by a written contract, agreement or waiver signed by the party after a fair disclosure. Unless the contract provides to the contrary, a waiver of all rights in the property or estate of a present or prospective spouse, or a complete property settlement entered into after or in anticipation of legal separation, divorce or dissolution of marriage is a waiver of all rights to an allowance in lieu of homestead, exempt property and family allowance by each spouse in the property of the other and a renunciation by each of all benefits which would otherwise pass to him from the other by intestate succession or by virtue of the provisions of any will executed before the waiver or property settlement. A waiver of all rights does not affect the rights of each spouse to his share of community property, in the absence of contrary provision; but a complete settlement terminates rights to community property in assets then owned or thereafter acquired, unless the settlement agreement provides to the contrary."

3. See, for example, Vernon's Ann.Tex.St. Const. art. 16, § 15, (as amended 1948); Vernon's Ann.Civ.St. arts. 4610 and 4624a, (as amended 1968); Vernon's Ann.Family Code, §§ 5.41 and 5.42, V.T.C.A. (as amended 1970).

transactions with said creditors have arisen from sole and separate property or from community property, and that said SPECTOR is released from any obligation to account to said GREENBERG for the use of any such community funds for any such purpose."

Greenberg contends that these provisions are contrary to A.R.S. §§ 25–201(A) and 25–211(A) [4] and therefore void. While it is true that § 25–211(A) establishes the community character of certain property acquired during marriage, it does not, as Greenberg suggests, prevent the parties from entering into a valid agreement concerning their present and prospective property rights. The same may also be said of § 25–201(A). This is apparent from such cases as Smith v. Tang, supra, and In re Estate of Harber, supra. While cases dealing with the present and future abrogation of community property interests in Arizona are lacking, *Harber* presages our holding here, as does considerable precedent in other jurisdictions. See, 3 Vernier, American Family Laws § 178.

At issue in the *Harber* case was an agreement made after the parties were married rather than one made in anticipation of marriage, as here. Nonetheless, we can see no reason why the same principles should not apply. In *Harber,* the agreement dealt extensively with a division and settlement of respective property rights of the parties. The agreement there was not upheld by the court because the proponents failed to carry their burden of proof in showing it was free of fraud, coercion and undue influence and that it was both fair and equitable. In so holding, however, the Arizona Supreme Court approved in principle such contractual dealings between marriage partners and set forth considerable law to support it. Commenting on the

position of the wife as a contracting party, the court said:

"We feel that in view of the relatively equal status of women to men under the law, that married couples should not be deprived of the right by contract to divide their property as they please, both presently and prospectively, asuming the contract is voluntary, free from fraud and is fair and equitable. [104 Ariz. 79, 87, 449 P.2d 7, 15.]

\* \* \* \* \* \*

"We adopt the proposition that marital partners may in Arizona validly divide their property presently and prospectively by a postnuptial agreement, even without its being incident to a contemplated separation or divorce. We also feel that this rule should include the built-in safeguards that the agreement must be free from any taint of fraud, coercion or undue influence; that the wife acted with full knowledge of the property involved and her rights therein, and that the settlement was fair and equitable." 104 Ariz. 79, 88, 449 P.2d 7, 16.

The protective shield which the law placed around women in an earlier day was of course necessary where they were unable to achieve a status equal to men. While society has removed the bars to equality at a rapid pace in recent years, the goal of equal status for women has been recognized for literally decades in Arizona courts. In Cosper v. Valley Bank, 28 Ariz. 373, 237 P. 175 (1925), the Supreme Court said:

"Development of the community property law of the western states has gone hand in hand with the general emancipation of women from the economic bonds which have so long burdened them. While under the common law the husband and wife were 'one,' and he was always the 'one,' the world has of recent

4. The statutory provisions referred to are those which were in effect when the agreement was made. A.R.S. § 25–201(A) is quoted earlier. The applicable part of A.R.S. § 25–211(A) then read:

"All property acquired by either husband or wife during the marriage, except that which is acquired by gift, devise or descent . . . is the community property of the husband and wife."

years gone a long way toward recognizing that even a married woman was a human being, with most of the rights of such, and that the status of marriage partook more of the nature of a partnership than that of master and servant, or guardian and ward. . . . " 28 Ariz. 373, 375–376, 237 P. 175, 176.

and, later, in Hall v. Weatherford, 32 Ariz. 370, 259 P. 282 (1927), it said:

"From the case of Charauleau v. Woffenden, 1 Ariz. 243, 25 P. 652, to that of Schofield v. Gold, 26 Ariz. 296, 225 P. 71, 37 A.L.R. 275, our attitude has been that the wife was an independent human being, with the full power to decide and determine for herself all questions involving her rights, and the old presumption that though before marriage, and during widowhood, she was as fully capable of managing her affairs as a man under the same circumstances, while coverture existed she lost all independent volition, knowledge, and capacity, and was to be treated as an infant under guardianship, so far as Arizona is concerned, is utterly obsolete. Since such is our theory of the marriage status, cases which are based either consciously or unconsciously on the old idea of the inferiority of the female sex and the subserviency of the wife to the husband are not in point. We hold that when property rights are concerned the same rule of estoppel applies to a woman as to a man; to the wife as to the husband; to a partner in the marriage relation as to a partner in any other relation of life." 32 Ariz. 370, 378, 259 P. 282, 285.

■ Having determined that A.R.S. §§ 25–201(A) and 25–211(A) do not prohibit prospective abrogation by the parties of their respective rights to community property thereafter acquired, we find no reason why an antenuptial contract should be accorded different legal treatment than a postnuptial contract. Indeed, there are impressive reasons why betrothed parties should consider their financial affairs before as well as after entering marriage.

We are aware that the right to enter into such agreements is important to a large number of citizens, as typified by the parties in this case. Of course, the standard by which the validity of both antenuptial and postnuptial agreements should be tested is more demanding than the ordinary contract, as enunciated in the *Harber* case.

■ Thus, we find that paragraph 1(c) confirms that certain earnings of the parties shall be community property, as they would be under § 25–211(A) in the absence of an agreement. As to other future earnings, prospective community ownership is abrogated and separate ownership by each party is provided. Obviously, the provision is intended to take into account earnings received by each party resulting from separate ownership of income-producing assets, thus avoiding the confusion in ownership arising from "mixed income." See, for example, the problems encountered in Lawson v. Ridgeway, 72 Ariz. 253, 233 P.2d 459 (1951); Porter v. Porter, 67 Ariz. 273, 195 P.2d 132 (1948).

■ Likewise, we find that paragraphs 3(e) and 3(g) of the agreement are valid. In the absence of such an agreement, there would, as pointed out by Greenberg, be a duty on the part of a husband to account to the wife for the expenditure of community funds, Spector v. Spector, 94 Ariz. 175, 382 P.2d 659 (1963), and to reimburse her for her share used to improve his separate property, Lawson v. Ridgeway, supra.

Next we turn to paragraph 3(c) of the agreement which states:

"(c) That after the marriage of GREENBERG and SPECTOR and so long as such marriage shall continue, SPECTOR agrees to provide a suitable home for them and to pay all of the usual household and personal expenses of both parties hereto, and the standard of living shall not be less than that which GREENBERG has had prior hereto."

■ Greenberg states that this provision purports to limit the duty of Spector for support in the event of divorce, contrary to public policy. She refers to the language

of the decision in Williams v. Williams, supra, in support of her argument that the provision is void:

"   .   .   It may be that such an agreement is perfectly valid in settling any rights which appellee acquired in the separate property of appellant by reason of the marriage. We, however, are decidedly of the opinion that it is void and contrary to public policy when the question of support to be adjudicated by a court in the case of either a limited or absolute divorce is involved. It is the duty of the husband to provide support for his wife during coverture. (citing authority). A contract in advance of the marriage whereby the wife waives such a right would certainly be contrary to public policy. (citing authority).

"We think it is equally contrary to public policy for the parties to contract in advance that, if through the fault of the husband his wife is granted a divorce, he shall nevertheless be relieved under any and all circumstances from the burden of providing support for his wife in such amount as the court may deem proper.   .   .   ." 29 Ariz. 538, 544–545, 243 P. 402, 404.

Whether the obligation of support can properly be made the subject of agreement between prospective spouses has not been squarely before Arizona appellate courts since 1926 in the *Williams* case. We note however that the subject has been analyzed by writers and decided by other courts in recent years. See, for example, Posner v. Posner, 233 So.2d 381 (Fla.1970); Reynolds v. Reynolds, 217 Ga. 234, 123 S.E.2d 115 (1961); Volid v. Volid, 6 Ill.App.3d 386, 286 N.E.2d 42 (1972); In re Marriage of Gudenkauf, 204 N.W.2d 586 (Iowa 1973); Clark v. Clark, 425 S.W.2d 745 (Ky.1968); Hudson v. Hudson, 350 P.2d 596 (Okl.1960); Unander v. Unander, 265 Or. 102, 506 P.2d 719 (1973); Fricke v. Fricke, 257 Wis. 124, 42 N.W.2d 500 (1950); Note, Recognition of the Alimony Provision in Ante-Nuptial Contracts, 10 Willamette L.J. 117 (1973); Note, Public Policy, The Courts and Ante-Nuptial Agreements Specifying Alimony, 23 U. Fla.L.Rev. 113 (1970); Note, Validity of Pre-Nuptial Agreement Fixing Alimony, 4 Creighton L.Rev. 180 (1970); Clark, Law of Domestic Relations, § 1.9 (1968); Lindley, Separation Agreements and Ante-Nuptial Contracts, § 90.

We find, however, that paragraph 3(c) of the Greenberg-Spector agreement does not purport to settle the question of post-divorce support, but rather sets forth certain responsibilities to be met by Spector during the course of the marriage. We are unable to discern in the quoted provision anything which would limit his responsibility for support following termination of the marriage and therefore reject Greenberg's argument as to the point.

We next examine paragraph 3(a) of the agreement against the contention of Greenberg that a contract to make a will purports to make a disposition of property contrary to the laws of descent in violation of A.R.S. § 25–201. The paragraph reads:

"(a) That immediately after marriage GREENBERG agrees to execute a Last Will and Testament in the form attached hereto, and made a part hereof as though set forth word for word at this point, which she agrees not to change insofar as the benefits to SPECTOR and/or his children or the survivor thereof are concerned, without his written consent, provided the parties have not separated or that neither party has filed an action for divorce against the other."

Greenberg argues that Groesbeck v. Groesbeck, 78 Tex. 664, 14 S.W. 792 (1890) and McDonald v. Stevenson, 245 S.W. 777 (Tex.Civ.App.1922) support this argument. We choose, however, not to follow the decision of Texas courts on this point, expecially in view of the recent constitutional and statutory changes in Texas. In any event, the cases cited did not involve the actual execution of a last will and testament and therefore are inapposite. One Arizona decision, In re Mackevich's Estate, supra, lights the way to some ex-

tent in this area. There the parties sought to establish an order of descent of property at the death of one of the spouses without utilizing "legally recognized inter vivos or testamentary methods." That is to say, they could have agreed to a certain disposition of property at death by promising to execute wills to carry this out. This is precisely what was done in this case. We find nothing in our law which would prohibit an antenuptial agreement in which the parties promise to execute wills containing certain desired provisions.

Finally, Greenberg contends that the agreement was invalid because it was unfair and induced by fraud and undue influence. We note first that the trial court made express findings of fact pertaining to the agreement as follows:

"A. That said agreement was supported by consideration.

B. That each party fairly and completely disclosed to the other the nature and extent of their then existing assets, liabilities and property rights.

C. That said agreement is not unconscionable.

D. That said agreement is clear and unambiguous.

E. That said agreement was not entered into by either party as a result of fraud or undue influence.

F. That both parties understood the terms of said agreement and entered into the same voluntarily and intelligently."

The appellate court must view the evidence and all reasonable inferences to be drawn therefrom in a light most favorable to upholding the orders of the trial judge. Spector v. Spector, supra. We have held that we will not weigh the evidence when it is conflicting and the decision of the trial court will be sustained if there is sufficient evidence to support it. Decker v. Ramenofsky, 91 Ariz. 97, 370 P. 2d 258 (1962). In our review of the evidence we find no indication of fraud or undue influence when the agreement was made. On the contrary, Greenberg was represented by counsel and discussed the proposed agreement with him prior to signing it. Indeed, the advisory jury unanimously found that she understood the terms of the agreement. As to the question of fairness, that too is measured as of the time of the execution of the agreement. Considering the existing circumstances of the parties, their relative net worth, the prospects for the future and provisions for the benefit of Greenberg in the event of Spector's death, we find no substantial evidence that the agreement was unfair. The applicable test is that which the Supreme Court applied to postnuptial agreements in *Harber*. The agreement must be free from any taint of fraud, coercion or undue influence; the prospective wife must have acted with full knowledge of the property involved and her rights therein, and the agreement must have been fair and equitable. Again, under *Harber*, it was Spector's burden to show these tests were met by clear and convincing evidence and we affirm the trial court's determination that they were.

## INCREASED VALUE OF SEPARATE PROPERTY

The increases, rents and profits from separate property during marriage remain separate property while those from community assets are community property. A.R. S. §§ 25–211 and 25–213. In some instances the increases, rents or profits of separate property may take on a community character in accordance with whether they are the result of the individual toil and application of the spouse or the inherent qualities of the asset itself. Rundle v. Winters, 38 Ariz. 239, 298 P. 929 (1931). It has been said that this states a correct formula but is difficult of application. Estate of Torrey, 54 Ariz. 369, 95 P.2d 990 (1939). See also, Evans v. Evans, 79 Ariz. 284, 288 P.2d 775 (1955); Lawson v. Ridgeway, supra, and Anderson v. Anderson, 65 Ariz. 184, 177 P.2d 227 (1947).

Greenberg contends that certain properties owned by Spector prior to the marriage were enhanced in value during the marriage by his toil and effort. She cites, in particular, the Linger Lane residence where the parties lived, and the Vita Trading Co., a corporation owned by Spector which held investment assets which included a ranch in Coconino County. Her specific contention is that having shown that the value of the properties was enhanced, Spector failed to present any evidence which would enable the court to separate that which was due to Spector's individual efforts and that which was due to the inherent nature of the property. She says that under such circumstances, all of the increase must be considered community property. Stauss v. Stauss, 82 Ariz. 268, 312 P.2d 148 (1957).

■ The evidence, however, negates the proposition that any substantial part of the increment in value was due to Spector's personal effort and the trial court so held. During the years of the marriage, Spector spent very little of his time in connection with the properties of Vita Trading Co. Any increase in value was almost totally due to the progressive increases in the value of Arizona real estate during the period. The same is true of the residence property. As to the latter, it is true that community funds were expended for payment of the mortgage and upkeep, but this was offset by the expenditure by Spector of his separate funds for community purposes considerably in excess of community income. All income and expenditures, including these, clearly appear from the detailed cash flow analysis prepared by Harold Toback, C.P.A. We note also that every deposit made and every check written by Spector during the marriage was placed in evidence in support of this analysis.

In any event, paragraph 1(a) of the antenuptial agreement, which we have held valid, provides that any and all increase in value of separate property belonging to Spector remains his separate property.

## EQUITY IN LAW PARTNERSHIP

During the course of the marriage, Spector practiced law as a partner of Richard S. Johnson in Phoenix. On May 31, 1967, the partnership was dissolved and the financial affairs arising therefrom became the subject of a lawsuit in the Maricopa County Superior Court. At the conclusion of this case in the trial court, the issues in the Spector-Johnson litigation had not yet been adjudicated, making a determination of the extent of the community interest in the firm impossible to determine. As a result, the trial court in the present case entered judgment pursuant to Rule 54(b), Arizona Rules of Civil Procedure, 16 A.R.S., which resolved all property and financial issues except equitable division of the community interest of the parties, if any, in the Spector-Johnson law partnership. The court reserved jurisdiction to determine and apportion their interest after the final determination of the Spector-Johnson lawsuit.

■ We find no error in this procedure. Rule 54(b) of the Rules of Civil Procedure allows the trial court to enter judgment on fewer than all of the claims presented. Clearly the disposition of these assets must await the outcome of the Spector-Johnson suit, while all other issues are resolved by the judgment in this one.

## ADVISORY JURY

The trial court impanelled a jury for the trial of this case at the request of Greenberg. Spector objected and was overruled by order of the court dated August 24, 1971. In its order, the court established that the jury was advisory only, as the action was equitable in nature. At the conclusion of the trial, the court submitted eleven special interrogatories to the jury encompassing many of the factual issues of the case. Upon the entry of its judgment, the court rejected all but one of the answers of the jury in arriving at its findings of fact and conclusions of law. Greenberg contends that it was error for

the court to have done so in view of the fact that there were legal as well as equitable issues in the case and that as to interrogatories relating to the former the court was bound by the answers given by the jury. She argues that the issues relating to the antenuptial agreement and its claimed breach by Spector and the question of the identities of separate and community property of the parties are legal not equitable questions.

■■■ There are two reasons why we cannot agree with this argument. First, Greenberg did not urge this to the trial court prior to either the commencement of trial or before submission of the interrogatories to the jury; hence, the trial court had no opportunity to consider it or to fashion interrogatories or instructions which would have made the determinations of the jury meaningful in the event they were to be binding. We have held that there is no error if the court fails to submit an issue of fact to an equity jury where there has been no request for an interrogatory on the subject by either party. Hammontree v. Kenworthy, 1 Ariz.App. 472, 404 P.2d 816 (1965).[5] Secondly, we hold that a cause of action in which the ultimate relief sought is equitable and for which neither party is entitled to a jury as a matter of right, written interrogatories submitted to the jury are advisory only, regardless of whether subsidiary issues in the case can be said to be "legal" as opposed to "equitable." Decisions from the State of Texas urged by Greenberg for us to follow do not light the way for Arizona courts in this area, hence we choose not to follow them.

■■■ Thus, we find that all of the interrogatories submitted to the jury in this case were advisory only. While they must be considered, as they were here, they are not binding upon the trial court. Bohmfalk v. Vaughan, 89 Ariz. 33, 357 P.2d 617 (1960); Williams v. Williams, supra.

There is ample evidence in the record to support the findings and conclusions of the court which led to the judgment ultimately entered.

## ALIMONY ·

■■■ The trial court determined that Greenberg, age 52, was in reasonably good health, was trainable and employable and was entitled to receive alimony for a period of time which would allow her to seek gainful employment. It awarded her a total of $6,000 payable in monthly installments of $500 each. The court also found that Spector was not in good health but was able to devote substantial time to the practice of law. As we review the evidence and the findings, we see that the trial court gave careful consideration to the factors which relate to the question of support. While it would serve no useful purpose to review all the financial evidence, we observe that Greenberg left the relatively short marriage with considerably more property than when she entered it. Among other things, the trial court awarded her not only the $13,670 as reimbursement for separate funds taken by Spector from her account, but also $18,000 as and for her equitable share of the community property in addition to the $6,000 sum for alimony. It is well settled that the question of alimony is left to the sound discretion of the trial court. De Marce v. De Marce, 101 Ariz. 369, 419 P.2d 726 (1966); Davis v. Davis, 9 Ariz.App. 49, 449 P.2d 66 (1969). Unless there is a clear abuse of discretion, the appellate court will not substitute its judgment for that of the trial court. Santa Maria v. Santa Maria, 18 Ariz.App. 313, 501 P.2d 582 (1972).

## ATTORNEYS' FEES

■■■ The trial court heard evidence as to the value of attorneys' services rendered in the case, which indeed was one of considerable detail and complexity. Without making an overall finding as to the to-

---

5. The opinion in this case written by Judge Molloy also furnishes an instructive review

of the right generally to jury trial in equity cases.

tal value of attorneys' services, it found that the reasonable value of attorneys' fees incurred by Greenberg which should be borne by Spector was $12,000. Legal fees are, again, a matter within the discretion of the trial court. Barnett v. Barnett, 95 Ariz. 226, 388 P.2d 433 (1964); Armer v. Armer, 105 Ariz. 284, 463 P.2d 818 (1970). In reviewing the evidence, we find no basis to disturb the trial court's determination on this issue.

This was a difficult and complex case as it proceeded through the pre-trial, trial and post-trial stages. We have reviewed the record and transcript and we find throughout a meticulous concern by the trial judge for correct application of the law to the facts. Since we find no reversible error, the judgment of the trial court is affirmed.

NELSON, P. J., and WREN, J., concur.