919 P.2d 179

**In re the Marriage of Denise B. HRUD-KA, and Trustee of the Estate of Denise B. Hrudka, Petitioner/Appellant,**

v.

**Joe HRUDKA, Respondent/Appellee.**

No. 1 CA–CV 93–0155.

Court of Appeals of Arizona, Division 1, Department B.

Nov. 21, 1995.

Reconsideration Denied Dec. 21, 1995.

Review Denied July 2, 1996.*

---

* Feldman, C.J., of the Supreme Court, recused himself and did not participate in the determination of this matter.

S. Alan Cook, P.C. by S. Alan Cook, Phoenix, for petitioner/appellant.

Burch & Cracchiolo, P.A. by Daniel Cracchiolo, Daryl Manhart, Donald W. Lindholm, Phoenix, for respondent/appellee.

## OPINION

EHRLICH, Judge.

Denise Hrudka ("Wife") appeals from the decree of dissolution, contesting various trial court rulings in favor of her former husband, Joe Hrudka ("Husband"). Married on August 20, 1978, the couple had significant assets and lived a lavish lifestyle before Wife filed a petition for dissolution on February 5, 1991. Both the dissolution proceeding and this appeal focus on the proper classification of the parties' property and debts, either as separate or community, and the distribution and assignment thereof. Wife raises the following issues:

1. Whether the trial court abused its discretion in denying Wife's motion to disqualify Husband's counsel;

2. Whether the trial court correctly refused to enforce the antenuptial agreement;

3. Whether the trial court erred in treating the CIT debt as a community obligation;

4. Whether the trial court properly determined that Husband did not give certain jewelry to Wife and that the jewelry therefore was community property;

5. Whether the trial court properly concluded that the 1987 Rolls Royce was community property rather than Wife's separate property;

6. Whether the trial court abused its discretion in entering a judgment for waste against Wife;

7. Whether the trial court erred in ordering community property sold to pay community debt;

8. Whether the trial court abused its discretion in ordering Wife to reimburse Husband for using his separate property to satisfy community debt;

9. Whether the trial court erred in refusing to award Wife her attorneys' fees and costs incurred in the dissolution proceeding.[1]

## A. Wife's Motion to Disqualify Husband's Counsel.

Throughout the dissolution proceedings, attorney Donald Lindholm of Burch & Cracchiolo represented Husband. However, prior to Husband retaining Lindholm, Wife had begun to consider filing for dissolution. In the spring of 1989, a mutual friend asked Michael Gallagher, another Phoenix attorney, to help Wife find an effective domestic relations lawyer. Gallagher suggested that Wife interview three attorneys, one of whom was

David Derickson, a partner at Burch & Cracchiolo. He then accompanied Wife to Burch & Cracchiolo's offices to meet Derickson.

Wife did not retain Derickson. Several months passed before she asked Gallagher to provide another attorney reference. Gallagher sent Wife to Philip Weeks, whom she retained. Weeks prepared and filed Wife's petition for dissolution on February 5, 1991. Husband then retained Lindholm, who filed a notice of appearance one month later.

The parties litigated the dissolution case for over eighteen months, conducting substantial discovery and arguing numerous motions. During the course of the proceedings, Wife visited the offices of Burch & Cracchiolo on several occasions to attend depositions, sign documents and pick up checks. She also received numerous letters on Burch & Cracchiolo letterhead which identified both Lindholm and Derickson as attorneys of the firm. Neither Wife nor any of her attorneys suggested that Lindholm (and Burch & Cracchiolo) had a conflict of interest in this matter until Rad Vucichevich appeared as co-counsel for Wife on August 5, 1992.[2] Vucichevich made no motion but advised the trial court that he believed that Husband's counsel had a conflict of interest disqualifying his firm from representing Husband in this case. The court, noting that the issue was newly-raised on the eve of trial, asked Vucichevich for Wife's position on the issue. Vucichevich responded that she had not yet expressed an opinion on the matter and the court set an evidentiary hearing on the disqualification issue.

At the hearing, Vucichevich made an oral motion to disqualify Husband's counsel. Wife testified that she did not consider Derickson to be her attorney. She also acknowledged that Gallagher had accompanied her to interview various attorneys but that she did not consider him to be her attorney either. Both Gallagher and Derickson testified that

---

1. In her opening brief, Wife also contended that the trial court erred in failing to find that Husband committed waste by giving his former spouse $1,000,000 and ordering an offset to the community estate for that amount. However, she withdrew this argument in her reply brief and we therefore do not address it.

2. By the time the disqualification issue was raised, Wife had changed Arizona counsel four times in this matter. Vucichevich associated with prior counsel Gerald Sherrill when the court would not let Sherrill withdraw. Wife also was represented by Cleveland and New York counsel at various times in this case.

the focus of Wife's meeting with Derickson was to gauge his experience with domestic relations cases and that it was Wife who had interviewed Derickson. Derickson acknowledged that there was a cursory discussion regarding the parties' property and prenuptial agreement and Wife's concern that Husband might try to conceal property. Wife had asked that they keep the conversation confidential, but Gallagher testified that Wife's concern regarding confidentiality was that no one learn she was contemplating dissolution. Derickson testified that he never opened a file for Wife, never charged her a fee and did not render any legal advice. He and Gallagher testified that they did not consider Wife to be a client of either one of them.

The trial court found unbelievable Wife's testimony that she was unaware that Lindholm and Derickson were associated with the same firm given her interview with Derickson at Burch & Cracchiolo's office, her repeated visits to that office to meet with Husband and Lindholm, and the extensive correspondence she had received bearing the firm's letterhead which identified both Lindholm and Derickson as lawyers with the firm.[3] The court further found that Wife's conversation with Derickson did not rise to the level of a privileged communication.[4]

■ The trial court did not abuse its discretion in denying Wife's motion to disqualify Husband's counsel. *Foulke v. Knuck,* 162 Ariz. 517, 519, 784 P.2d 723, 725 (App. 1989) (trial court's denial of motion to disqualify counsel subject to abuse of discretion standard). In considering the formation of any attorney-client relationship between Wife and Derickson, we must determine if the Wife sought and received advice and assistance from Derickson "in matters pertinent to the legal profession." *Id.* at 520, 784 P.2d at 726. The test is a subjective one, requiring us to examine factors such as the nature of the services rendered, the circumstances under which Wife divulged confidences, Wife's belief that she was consulting a lawyer in that capacity and her manifested intention to seek professional legal advice. *Id.* The payment of a fee, although not required, is indicative that an attorney-client relationship has been established. *Id.*

Here, the record is sufficient to uphold the trial court's ruling that no such relationship was formed. Derickson did not bill time for the meeting, open a file or charge Wife any fee. Rather, the evidence indicated that the meeting with Derickson was one of several interviews of attorneys Wife had to determine whom she might want to retain if she filed for dissolution. Little, if any, personal information was revealed during the interview. Moreover, Wife did not demonstrate a reasonable expectation that any information revealed would remain confidential. To the contrary, she admitted that she did not consider Derickson to be her attorney. Furthermore, she stated that she did not consider Gallagher to be her attorney, yet she allowed him to accompany her on interviews with the recommended attorneys and to remain in the offices while they discussed her possible dissolution.

■ Even if we were to find that Wife and Derickson had formed an attorney-client relationship, disqualification would be an excessive result in this case. In resolving conflicts of interest, courts should attempt to reach the solution that is the least burdensome upon the client. *Id.* at 521, 784 P.2d at 727. Disqualification may be avoided if the hardship to the new client far outweighs the injustice to the former client who requests disqualification. *Id.* at 523, 784 P.2d at 729.

---

**3.** The court also discounted Wife's testimony that she had a second meeting with Derickson at which she paid him an unspecified sum of cash. The court found this testimony lacked credibility given Derickson's denial of a second meeting or receipt of any payment, Gallagher's recollection of only one meeting with Derickson, Wife's inability to recall the amount she had paid to Derickson or to produce a receipt for the alleged retainer, and the fact that Wife never retained further services from Derickson or sought reimbursement of the retainer. Further, the court found it suspicious that Wife recalled her meetings with Derickson with great detail but could not recall conversations with other counsel she interviewed at the same time.

**4.** Wife filed a petition for special action contesting this ruling on September 4, 1992. This court declined jurisdiction by order of October 1, 1992 (1 CA–SA 92–0217).

The parties actively litigated this case for a year and a half and were on the brink of trial before Wife raised the issue of disqualification. Unlike *Foulke*, this is "a situation where disqualification is sought after months or years of representation in a complicated litigation." *Id.* As such, we find that disqualification would be an excessive penalty and we affirm the trial court's denial of the motion for disqualification.

## B. The Antenuptial Agreement.

Prior to the marriage, Husband had an estimated net worth of $8 to $10 million. He owned several parcels of real estate, significant stock in W.R. Grace Company,[5] homes in Palm Springs and Cleveland, an extensive car collection, and had a considerable investment account at the investment firm of Goldman Sachs. Two days before the wedding, Husband presented Wife with an antenuptial agreement ("Agreement"), stating that the wedding would be canceled if she did not sign it. This was the first time that Husband had suggested such an agreement to Wife. After consulting with an attorney, Wife was advised not to sign the Agreement. At trial, she testified that she did not understand the Agreement and never saw a disclosure of Husband's assets. Despite her misgivings, she signed the Agreement, feeling pressured by the imminent plans and relying on Husband's representations that he would not enforce the Agreement. The wedding took place as set.

During the dissolution proceedings, Husband initially sought enforcement of the Agreement and Wife opposed it. The parties changed their positions on this issue in the midst of the case, Husband arguing that the circumstances surrounding Wife's execution of the Agreement rendered it unenforceable, and Wife, though continuing to maintain that she had been under duress, urging enforcement. The trial court found that "[t]he agreement *per se* [did] not violate public policy" but held that it was unenforceable in

light of Wife's testimony that she had signed the Agreement under duress and "while in a fragile emotional state."

■ Arizona recognizes the validity of antenuptial agreements, including agreements regarding spousal maintenance, provided that they do not violate the law or the public policy of this state. *Williams v. Williams*, 166 Ariz. 260, 262, 801 P.2d 495, 497 (App.1990). Former Arizona Revised Statutes Annotated ("A.R.S.") section 25–201 provided that "[p]arties intending to marry may enter into agreements not contrary to good morals or law." [6] Section 25–203(A)(8) currently provides that "[p]arties to a premarital agreement may contract with respect to . . . [a]ny . . . matter, including their personal rights and obligations, not in violation of public policy or a statute imposing a criminal penalty."

■ A party seeking to enforce an antenuptial agreement such as this one, which was executed before the effective date of Arizona's Uniform Premarital Agreement Act, A.R.S. §§ 25–201 to –205, must show by clear and convincing evidence, *Spector v. Spector*, 23 Ariz.App. 131, 140, 531 P.2d 176, 185 (1975), that the agreement was fairly reached and that enforcement of the spousal maintenance provision will not "render one spouse without a means of reasonable support or a public charge, either because of a lack of property resources or a condition of unemployability." *Williams*, 166 Ariz. at 263, 801 P.2d at 498. Wife has met that burden with regard to *Husband's* informed execution of the Agreement and the financial burdens placed on *Husband* under the Agreement. Husband has never contested these facts.

■ Although Husband does not claim that he did not knowingly and willingly enter the Agreement, he contends that, under *Williams* and *Spector*, the Agreement cannot be enforced. He argues that the cases require Wife to prove that the Agreement was

---

5. Prior to the marriage, Husband owned a business called Mr. Gasket. He sold the company before marriage for approximately $12 million worth of stock in the purchaser, W.R. Grace Company.

6. Section 25–201 was repealed by the Arizona Uniform Premarital Agreement Act, Laws 1991, Ch. 4, sec. 1, eff. Sept. 21, 1991. *See now* A.R.S. §§ 25–201 to –205 (1994 Supp.).

fair to *both* parties and free of coercion or undue influence at the time of execution, and that she cannot demonstrate that she was not under duress at the time she executed the Agreement.[7] We disagree. In both *Williams* and *Spector*, the spouse *opposing* the agreement was claiming that the agreement was coercive or executed while she was under duress. *Id.* at 261, 801 P.2d at 496; *Spector*, 23 Ariz.App. at 134, 531 P.2d at 179. In this case, the spouse who was coerced into signing the agreement is seeking its enforcement. In such a context, the relevant inquiry is whether the spouse seeking enforcement of the agreement has demonstrated by clear and convincing evidence that the spouse *opposing* enforcement executed the agreement voluntarily, and with fair and reasonable disclosure of the property and financial obligations of the other spouse.[8] Wife met this burden in this case and the trial court should have enforced the parties' antenuptial agreement.

### C. The CIT debt as a community obligation.

During the marriage, Husband obtained loans from CIT Financial Group ("CIT"), evidenced by a note for over $3.5 million and a second note for $1 million, for the acquisition and refurbishing of a jet aircraft. Wife did not sign either promissory note. Husband testified that the jet was an investment for the community and that a corporation was formed to hold title to the jet and record expenses until it was sold. When the loans were not timely repaid, CIT sued the parties.[9] In that lawsuit, Husband initially de-

nied that the debt was a community obligation. However, judgment was taken against both Husband and Wife on August 6, 1991, in the amount of $3,745,378.90, plus accrued interest of $307,103.71, plus accruing interest of $1,072.18 per day from March 28, 1991. After judgment was entered, Wife appeared separately through counsel and sought relief from the judgment. The trial court granted Wife's motion in part, dismissing her from the matter individually, but affirmed the judgment as to Husband and the marital community. Wife did not appeal from this ruling.

At trial of the dissolution case, Husband contended that the CIT debt was a community obligation, while Wife asserted that it was the separate obligation of Husband. The trial court determined that the CIT loan funds were acquired during marriage for the purchase of the jet aircraft and that "[t]he debt has been adjudicated and is a community debt."

We must determine whether the trial court's determination that the CIT debt was a community obligation was clearly erroneous. *Federoff v. Pioneer Title & Trust Co. of Arizona*, 166 Ariz. 383, 388, 803 P.2d 104, 109 (1990) (appellate courts adopt deferential standard in reviewing trial court's factual findings and will sustain such findings unless clearly erroneous or unsupported by any credible evidence). We do not find the court's classification of the debt to be clearly erroneous.

A debt incurred by a spouse during marriage is presumed to be a community

---

**7.** In fact, Wife maintains that Husband coerced her into signing the Agreement, failed to adequately disclose his financial circumstances to her and misrepresented the effect of the Agreement.

**8.** The Legislature has adopted this approach in determining the enforceability of antenuptial agreements. *See* A.R.S. § 25–202(C):

The agreement is not enforceable *if the person against whom enforcement is sought* proves either of the following:
1. The person did not execute the agreement voluntarily.
2. The agreement was unconscionable when it was executed and before execution of the agreement that person:

(a) Was not provided a fair and reasonable disclosure of the property or financial obligations of the other party.
(b) Did not voluntarily and expressly waive, in writing, any right to disclosure of the property or financial obligations of the other party beyond the disclosure provided.
(c) Did not have, or reasonably could not have had, an adequate knowledge of the property or financial obligations of the other party.
(Emphasis added.)

**9.** *See The CIT Group/Equipment Financing, Inc. a New York Corp. v. Joseph F. and Denise Hrudka, husband and wife,* Maricopa Co. Cause No. CV 91–07995 ("CIT lawsuit").

obligation; a party contesting the community nature of a debt bears the burden of overcoming that presumption by clear and convincing evidence. *Donato v. Fishburn*, 90 Ariz. 210, 213, 367 P.2d 245, 246 (1961); *Lorenz-Auxier Financial Group, Inc. v. Bidewell*, 160 Ariz. 218, 220, 772 P.2d 41, 43 (App.1989). Wife did not meet that burden.[10] Substantial evidence was presented that the loans were for an investment in an aircraft, an investment made on behalf of the community. Indeed, the CIT obligation was previously adjudicated to be a community obligation.

 As for Wife's contention that Husband is precluded from claiming that the CIT obligation is a community debt in this case because he asserted that the debt was a separate obligation in the CIT lawsuit, it appears that she is misapplying the doctrine of judicial estoppel. Under that doctrine, a party who *successfully* asserts a particular position in one judicial proceeding will not be allowed to assert an inconsistent position in a subsequent proceeding. *Standage Ventures, Inc. v. State*, 114 Ariz. 480, 483–84, 562 P.2d 360, 363–64 (1977). However, a party that is unsuccessful with the first position asserted thereafter may take an alternative position in a latter proceeding. *Id.*[11] Because Husband was unsuccessful in contending that the CIT debt was a separate obligation in the CIT lawsuit, he was not barred from asserting that it was a community obligation in this case. To the contrary, it is Wife who is precluded from litigating the community nature of this debt because she failed to appeal from the trial court's determination in the CIT lawsuit that the debt was a community obligation. She is therefore collaterally estopped from relitigating the issue in this case. *Barassi v. Matison*, 134 Ariz. 338, 340–41, 656 P.2d 627, 629–30 (App.1982) (when issue adjudicated in former suit, party

bound by judgment estopped from producing at second trial new arguments or different evidence in support of proposition decided against him).

### D. Wife's Jewelry.

 The parties spent over $1 million on jewelry during the marriage. At trial, they disputed ownership of many items. Although Husband acknowledged that he had given certain items to Wife as presents, he contended that much of the jewelry was purchased as an investment to ensure the parties' security in later years and that it was community property. Wife claimed that most of the jewelry was given to her and constituted her separate property. Additionally, several items of jewelry were missing. The parties presented the trial court with an appraisal listing 45 items of jewelry. The court determined that 20 items were the separate property of Wife, nine items were the separate property of Husband and the remaining items (including some of the missing items) were community property. Wife disputes the latter conclusion regarding community property.

 The determination of whether a gift has been made is a question of fact. *Chirekos v. Chirekos*, 24 Ariz.App. 223, 227, 537 P.2d 608, 612 (1975). We will not disturb a trial court's factual findings unless clearly erroneous. *Federoff*, 166 Ariz. at 388, 803 P.2d at 109. "All property acquired by either husband or wife during the marriage, except that which is acquired by gift, devise, or descent is the community property of the husband and wife." A.R.S. § 25–211. To overcome the presumption that the jewelry acquired during marriage was community property, Wife had to demonstrate by clear and convincing evidence the separate nature of the property. *Donato*, 90 Ariz. at 213, 367

---

**10.** We are not persuaded by Wife's claim that the CIT debt should be treated as a personal guaranty which is presumed to be a separate obligation under A.R.S. section 25–214(C)(2). The CIT loans were direct obligations in the form of promissory notes, not guarantees, and Wife has failed to state any support for her contention.

**11.** Essential to the concept of judicial estoppel is the principle that a party "has gained an advan-

tage—obtained judicial relief—in one action by asserting one position, and that in view of his having gained that advantage, he must accept the burdens of that position in any subsequent litigation." *Standage*, 114 Ariz. at 484, 562 P.2d at 364 (*quoting State Farm Auto. Ins. Co. v. Civil Service Emp. Ins. Co.*, 19 Ariz.App. 594, 600, 509 P.2d 725, 731 (1973)).

P.2d at 246; *Bidewell,* 160 Ariz. at 220, 772 P.2d at 43.

The parties presented conflicting testimony regarding whether the jewelry was purchased by Husband as a gift for Wife or as an investment for the community. The decree suggests that the trial court, in awarding a substantial amount of the jewelry to Wife, was influenced by testimony connecting the presentation of an item of jewelry with a special occasion such as an anniversary, birthday or birth of a child.

■ Wife bases her claim of gift upon an assertion of possession, i.e., that, at some point, Husband physically handed over items of jewelry to her and she wore them. However, this testimony alone does not establish a gift. Rather, Wife must demonstrate (1) donative intent, (2) delivery and (3) a vesting of irrevocable title on delivery. *Armer v. Armer,* 105 Ariz. 284, 289, 463 P.2d 818, 823 (1970). Testimony that Wife sometimes wore the jewelry does not establish that it was intended as a gift and not an investment. We cannot find that the trial court's ruling was clearly erroneous on this issue.

### E. The 1987 Rolls Royce.

■ At trial, the parties disputed the ownership of a 1987 Rolls Royce. Wife contended that the car was a 1987 Valentine's Day gift because it was presented to her with a red bow wrapped around it, while Husband claimed that the car was community property, that he purchased it as an investment and partially paid for it through the trade-in of another Rolls Royce. Although the purchase invoice did not reflect a trade-in, the salesman and the parties' accountant testified that Husband traded-in another Rolls Royce around that same time. Furthermore, the salesman testified that he, not Husband, decided to deliver the car with a red bow on it as a gesture to the parties since the car was purchased around Valentine's Day. More significantly, the parties kept the Rolls Royce in their garage and, except for a few miles, refrained from driving it to preserve its value.

As stated above, donative intent is a factual determination, *Chirekos,* 24 Ariz.App. at 227, 537 P.2d at 612, which we will not overturn unless clearly erroneous. *Federoff,* 166 Ariz. at 388, 803 P.2d at 109. In light of the evidence, the trial court did not err in finding that the Rolls Royce was community property.

### F. The Judgment for Waste Against Wife.

■ Wife contests the trial court's ruling that she was liable to Husband for waste. The court determined that: (1) Wife had final possession of several items of jewelry, antique furnishings and artworks which were missing and which had a total approximate value of $600,000; (2) Wife had conducted her case in such a manner as to protract the litigation and increase Husband's attorneys' fees; and (3) Wife refused to cooperate in resolving creditor claims which led to substantial interest being charged against the community.

■ When there is waste or dissipation of marital assets by one spouse, the trial court may, when apportioning the community property, award money or property sufficient to compensate the other spouse for that waste. *Martin v. Martin,* 156 Ariz. 452, 458, 752 P.2d 1038, 1044 (1988). A.R.S. section 25–318(A) specifically allows the court to consider excessive or abnormal expenditures, as well as the destruction, concealment or fraudulent disposition of community property when apportioning the assets of the community. We review the court's apportionment of community property for an abuse of discretion. *Miller v. Miller,* 140 Ariz. 520, 522, 683 P.2d 319, 321 (App.1984).

Evidence was presented that Wife transferred, concealed and sold substantial assets in violation of a trial court order; that she either sought to evade completion of depositions or gave evasive and dishonest answers regarding the location of assets; that she encouraged non-parties, such as her mother and boyfriend, to avoid service of process or provide evasive answers regarding the location of assets at deposition; and that she continually changed counsel, thereby delaying the proceedings until newly-retained counsel could familiarize himself with the case. Further, when Wife finally arranged for the return of certain assets after being

incarcerated for contempt, some of the furnishings and art pieces were returned damaged. Under these circumstances, we affirm the court's finding of waste on Wife's part and its conclusion that equity favored the distribution of a greater share of community assets to Husband.

Wife objects on appeal to the trial court's failure to make specific findings regarding the individual items of waste. Because she did not raise this contention below, we will not consider it here. *Elliott v. Elliott,* 165 Ariz. 128, 134, 796 P.2d 930, 936 (App.1990) (litigant must object to inadequate findings of fact and conclusions of law at trial court level so that court will have opportunity to correct them). In addition, we recognize that it was because of Wife's obstructionist behavior that the extent of waste had to be estimated.

Wife also contends that the trial court exceeded its authority by ordering her to sign a creditor-workout agreement and by not providing her with an evidentiary hearing on the matter. We disagree. The court merely ordered Wife to cooperate in the culmination of the workout agreement after finding the agreement to be in her and the community's best interests.[12] The court never ordered her to sign the agreement or the conveyance of any assets pursuant to the agreement. Additionally, it offered to hold an evidentiary hearing on the matter, but Wife's new counsel was not prepared to present evidence on the issues and declined the offer.

### G. The Sale of Community Property to Pay Community Debt; Reimbursement of Husband for Use of Separate Property to Pay Community Debt.

In its decree, the trial court set forth the community obligations and its finding that Husband had *involuntarily* applied some of his separate property to payment of community debts. The court ordered that the community property be sold to first satisfy community obligations, then to reimburse Husband for the separate property used to pay community expenses, then to reimburse Husband for the judgment of waste against Wife, with the remainder then to be divided between the parties. Wife contests the court's authority to enter this ruling.

A spouse who voluntarily applies separate property to payment of community debts may be deemed to have made a gift to the community. Reimbursement may be ordered, however, if there was no gift. *In re Marriage of Berger,* 140 Ariz. 156, 163, 680 P.2d 1217, 1224 (App.1983) ("right to reimbursement is an equitable right and ... recovery should be just and equitable under all the circumstances."). The question of reimbursement is a factual issue of gift and subject to the clearly erroneous standard. *Id.* at 161, 680 P.2d at 1222. There was evidence that Husband used separate property, such as his commercial properties in Ohio, to satisfy community debt and that he was forced to do so by Wife's failure to agree to a creditor-workout agreement or otherwise cooperate in the liquidation of community assets to satisfy these obligations. The trial court did not err in requiring reimbursement to Husband and it did not exceed its authority in ordering the community property sold to satisfy community obligations or Wife's indebtedness to Husband. *See also,* A.R.S. § 25–318.

### H. Wife's Attorneys' Fees and Costs.

The trial court ordered that each party was responsible for his or her attorneys' fees. It specifically found that it would be:

> an abuse of discretion to require the Husband to be responsible for the Wife's attorneys' fees. The attorneys' fees of the Husband have been increased beyond fees necessary to conduct this litigation due to actions of the Wife.

Wife also testified at trial that Husband had already paid about $54,000 of her attorneys' fees.

The decision whether to award attorneys' fees lies within the trial court's

---

12. Evidence was presented that the workout agreement provided the parties with a means of extinguishing substantial debt while protecting them from an unmanageable amount of debt service and preserving some $4 million of personal property which was otherwise subject to attachment by creditors.

sound discretion. *Mori v. Mori,* 124 Ariz. 193, 199, 603 P.2d 85, 91 (1979). A.R.S. section 25–324 provides the framework for awarding attorneys' fees in dissolution cases, with the focus on the parties' relative abilities to pay the fees incurred. Wife claims that the court abused its discretion by not assessing all of her fees against Husband because he is the wealthier party.

 Given the change in the parties' financial circumstances,[13] it is unclear that Husband has greater financial resources than Wife. Further, in determining whether to award fees, the trial court properly considered Wife's actions, such as concealing assets, that increased the costs of discovery and litigation. *Id.* The court did not abuse its discretion on this issue.

**13.** The parties were having financial difficulties throughout the litigation. Husband's company, Mr. Gasket, was in bankruptcy proceedings and the security of his position at the company was in question. Wife filed for personal bankruptcy. The bulk of the parties' assets was used to pay

## CONCLUSION

We affirm on all issues presented except for the trial court's failure to enforce the antenuptial agreement. We reverse that portion of the decree of dissolution and remand with instructions to reconsider the decree in accordance with this decision.

THOMPSON, P.J., and KLEINSCHMIDT, J., concur.

community obligations which had come due, and both parties had incurred substantial attorneys' fees and other expenses in this matter.