977 P.2d 796

James P. ELIA, a single man, Plaintiff–Appellant,

v.

Stacy PIFER, also known as Stacy Olliphant, and John A. Pifer, her husband; Stacy Olliphant, P.C., Defendants–Appellees.

No. 1 CA–CV 97–0386.

Court of Appeals of Arizona, Division 1, Department B.

Sept. 3, 1998.

Review Denied May 25, 1999.

Meehan & Associates by Michael J. Meehan, Mark Dinell, Tucson, for Appellant.

Broening, Oberg, Woods, Wilson & Cass by Michael M. Haran, Phoenix, for Appellees.

## OPINION

TOCI, Judge.

¶ 1    James P. Elia sued Stacy Olliphant Pifer ("Pifer"), his former domestic relations attorney, for malpractice in settling his dissolution action.  He asserted that Pifer was liable for negligence because he had not authorized her to settle the dissolution action on the terms expressed in the decree.  The jury returned a verdict in favor of Pifer.

¶ 2   Elia appeals from the judgment entered upon the jury verdict and from the denial of his motion for new trial. He asserts numerous errors, one of which we find requires reversal. The question is whether Elia's opening statement remarks "opened the door" to Pifer to introduce as an issue in the case a previous finding by the Board of Dental Examiners ("Board") that Elia had engaged in fraudulent misconduct. Because we conclude that the trial court erred in permitting Pifer to litigate this issue, we reverse. The remaining issues raised by Elia may arise on remand and we resolve those issues as well.

## I. FACTS AND PROCEDURAL HISTORY

¶ 3   This malpractice action against Pifer is rooted in the following facts. In April 1988, Elia, a practicing dentist in the Phoenix metropolitan area, sued his wife for dissolution. In October 1989, Pifer was substituted as Elia's attorney. Pifer continued to represent Elia until September 1990, when she withdrew with Elia's consent.

¶ 4   The domestic relations judge assigned to the case appointed Michael Halladay, an attorney and a judge pro tempore of the superior court, to act as Special Master to narrow the issues in the case. Halladay conducted a series of meetings with the parties and their attorneys in an effort to settle the dissolution matter. On September 5, 1990, at a meeting attended by Pifer, Halladay, Elia's wife and her attorney, but not by Elia, the parties worked out the details of a final decree. The same day, Halladay signed and filed a decree of dissolution of marriage. The decree resolved all issues except an issue of support arrearages arising from an earlier pendente lite order. In the decree and in a minute entry entered that same date, Halladay stated that the decree expressed the agreement of the parties that had been worked out in his presence.

¶ 5   The day after the decree was filed, Elia filed a petition in bankruptcy. He was represented at this hearing by Robert Mothershead. The following day, September 7, 1990, Elia, represented by Mothershead, and Pifer, appeared before Halladay concerning payment of the support arrearages. After this hearing, Pifer no longer represented Elia.

¶ 6   Over the next few years, Elia and his former wife litigated a number of domestic relations disputes arising from the September 5, 1990 decree. On one occasion, Elia attempted to modify the custody provisions of the dissolution decree. On other occasions, his former wife filed actions against Elia to enforce child support and spousal maintenance provisions contained in the decree. Elia was represented in all of these matters by Herbert W. Kalish. Kalish was formally appointed as special counsel for Elia by the bankruptcy court in January 1991.

¶ 7   Elia's attorneys waited for months before they directly attacked the dissolution judgment. According to bankruptcy law, Elia had sixty days after his bankruptcy petition was filed on September 6, 1990, to appeal the decree of dissolution. He did not do so. Nor did he file a motion for new trial pursuant to Rule 59, Arizona Rules of Civil Procedure, within the fifteen days prescribed by the rule. His motion for new trial was filed on October 15, 1991, more than a year after the filing of the bankruptcy petition. The motion was denied.

¶ 8   Neither did Elia file a timely motion to set aside the judgment pursuant to Rule 60(c) of the Arizona Rules of Civil Procedure. That rule requires diligence in filing and prescribes a cut-off date of six months after entry of the decree when asserting certain grounds. Elia's Rule 60(c) motion was not filed until May 5, 1992, nearly two years after the decree was entered. That motion was also denied.

¶ 9   Mothershead had advised Elia that he would seek relief from the dissolution decree in the bankruptcy proceeding. But after he filed the request for relief in that court, the bankruptcy judge concluded as follows on February 26, 1992, a year and a half after the decree had been entered:

The judgment and decree of dissolution of marriage filed September 5, 1990 and entered in Maricopa County Superior Court, a copy of which is annexed [hereto], is a valid judgment and decree and binding on this court until such time as it is modified or set aside by a state court of compe-

tent jurisdiction. The time for appeal from that judgment expired 60 days after September 6, 1990, in accordance with 11 U.S.C. § 108.

¶ 10　Elia eventually filed this suit for malpractice against Pifer on September 4, 1992. His principal complaint against her was that she had agreed to a settlement of the dissolution case for him without his authority. As part of his damages, he sought to establish that the terms of the dissolution Pifer obtained for him were unduly burdensome. Also, he claimed that he suffered additional damages due to Pifer's negligence when the court jailed him for contempt for failing to pay spousal maintenance and child support required by the decree.

¶ 11　Pifer contended at trial that she had not been negligent. She introduced evidence that Elia had agreed to the settlement and had authorized her to approve the final wording of the decree. She also sought to establish that, even if she were at fault, Elia had not been damaged by her actions because he was better off under the settlement than he would have been had he gone to trial. Finally, she produced evidence that Elia's jailing for contempt had been due to his own willful behavior rather than any fault on her part.

¶ 12　Alternatively, Pifer claimed that Elia and the attorneys that succeeded her in representing Elia were responsible, in whole or in part, for his damages. She argued that Elia was liable for failing to mitigate damages by timely seeking a proper remedy from the court. She made similar claims against Mothershead, the bankruptcy attorney, for failing to move to set aside the decree.

## II. DISCUSSION

**A. Did the trial court err when it allowed Pifer to present evidence that Elia had falsified dental records to rebut statements made by Elia's counsel in opening statement?**

¶ 13　Elia argues that the trial court erred in allowing Pifer to introduce as an issue in the trial a decision of the Board that Elia had falsified dental charts. Elia's counsel had mentioned in his opening statement that Pifer would challenge the authenticity of a telephone message slip, purportedly from her file, memorializing Elia's objections to the dissolution decree. We conclude that these remarks did not "open the door" to proof of Elia's prior misconduct barred by Arizona Rule of Evidence 404(b) and that such evidence was prejudicial to Elia's case.

¶ 14　Before trial, Elia asserted that he had telephoned Pifer's office and given instructions to someone in her office that she not send a letter agreeing to certain settlement terms. At Pifer's deposition, when she was confronted with a telephone message slip from her file purportedly containing this message, she said that she did not believe that the memorandum was written in her office. She also testified at her deposition that Elia had come into her office on occasion and "rampaged" through the files. Despite Pifer's deposition testimony, her attorneys stipulated prior to trial that the message slip was admissible in evidence.

¶ 15　In his opening statement, Elia's counsel made an issue of Pifer's deposition statement. He advised the jury that Pifer was probably going to testify that Elia somehow got into Pifer's files and fabricated the telephone message telling Pifer not to send the letter agreeing to settlement. Elia's counsel stated that with the telephone message slip the jury could figure out "who was in contact with whom at a given time."

¶ 16　Before Pifer's counsel began his opening statement, he advised the judge that he now planned to argue and present evidence regarding Pifer's deposition statement because Elia's counsel had brought up the subject. He said that he intended to show that Elia had been found by the Board to have fraudulently altered a patient's records. He asserted that this evidence was admissible to show what Pifer's state of mind had been when she stated at her deposition that the telephone slip was not made in her office.

¶ 17　The trial court allowed Pifer's counsel's remarks in opening statement, finding that Elia's attorney had opened the door to allow it. Pifer later testified that the reason she thought the telephone message was altered by Elia was that he had been found "guilty" by the Board of altering records. She also testified that the Board's ruling was upheld on appeal.

¶ 18  It is true, as Pifer argues, that a party will not be allowed to complain of the introduction of irrelevant evidence where he has asserted a position that makes such evidence relevant.  Morris K. Udall et. al, *Law Of Evidence* § 11, at 11 (3d ed.1991).  Here, although the telephone message slip was a crucial part of Elia's case,[1] the slip's relevance and authenticity were not at issue when trial began because the parties stipulated before trial that the message slip was admissible.  *See Pulliam v. Pulliam*, 139 Ariz. 343, 345, 678 P.2d 528, 530 (App.1984) (parties are bound by their stipulation unless relieved therefrom by the court).  When Elia suggested in his opening statement that Pifer might accuse Elia of fabrication, however, that suggestion made the authenticity of the telephone message slip relevant.

¶ 19  The question here, however, is whether Elia opened the door to character evidence—evidence that Elia engaged in prior misconduct.  Pifer argued to the trial judge that the Board's findings were admissible because Pifer knew about them and "it goes to her state of mind concerning the alteration of documents."  We disagree.

¶ 20  Pifer's state of mind was never an issue in the case.  The only evidence to which Elia's remarks opened the door in rebuttal was evidence that pertained to the issue of the authenticity of the telephone message slip.  Pifer's state of mind—her speculation that Elia might have falsified the message because he had been found by the Board to have falsified other documents—was irrelevant to this issue.  Evidence of the Board's findings of Elia's misconduct was inadmissible character evidence clearly beyond the scope of the issue raised by Elia in opening statement.

¶ 21  The prohibition against the admissibility of character evidence to prove that an individual acted in conformity therewith is applicable in civil cases.  *Bell v. State*, 143 Ariz. 305, 308, 693 P.2d 960, 963 (App. 1984).  Character evidence is barred because it has slight probative value and because admission of such evidence gives rise to a strong likelihood of prejudice.  *Id.*  Such evidence "subtly permits the trier of fact to reward the good man and to punish the bad man because of their respective characters despite what the evidence in the case shows actually happened."  *Id.* at 309, 693 P.2d at 964 (citations omitted).

¶ 22  This court will not disturb the trial court's rulings regarding the exclusion or admission of evidence unless a clear abuse of discretion appears and prejudice results.  *Selby v. Savard*, 134 Ariz. 222, 227, 655 P.2d 342, 347 (1982); Ariz. R. Evid. 103(a)(error in the admission of evidence is reversible only if a substantial right of the party is involved).  Here, the jury was permitted to hear not only that the Board had concluded that Elia had engaged in fraudulent misconduct in altering records, but that the case had been affirmed on appeal.  Furthermore, Pifer was allowed to state her personal opinion, based solely on the inadmissible evidence of the Board proceedings, that Elia had altered a crucial piece of evidence.

¶ 23  We conclude that the admission of this evidence was reversible error.  Elia had a substantial right to have this case tried on the issue of Pifer's negligence rather than on the issue whether Elia was a good or bad person.  The evidence of Elia's fraudulent misconduct on another occasion deprived him of this right;  the evidence was prejudicial because it necessarily invited the trier of fact to decide this case on factors other than those directly related to Pifer's negligence.  *See Henson v. Triumph Trucking, Inc.*, 180 Ariz. 305, 307, 884 P.2d 191, 193 (App.1994).

¶ 24  Because this matter must be tried again, we address the remaining issues raised by Elia.

**B.  Did the trial court err when it ruled that Elia was collaterally estopped from relitigating certain issues that had been decided against him in orders entered in his domestic relations cases?**

¶ 25  We conclude that although the contempt judgment was not appealable, it

---

1.  The memorandum states: "Doesn't want you to send the letter to Halladay.  He thinks the numbers are to [sic] high.  He doesn't think he can afford it.  Doesn't want to have to eventually file bankruptcy.  Please call."

was subject to special action review and was therefore "final" rather than merely tentative or interlocutory. The findings made in the contempt judgment that were given collateral estoppel effect by the trial court in this case were "sufficiently firm" to be accorded conclusive effect in this subsequent action. The trial court did not err in giving collateral estoppel effect to such findings.

¶ 26 Before trial, Pifer moved in limine to have findings made in previous orders against Elia in other legal proceedings applied by collateral estoppel to this case. The principal orders at issue here are the orders finding Elia in contempt of court for failing to make child support and spousal maintenance payments. Over Elia's objection to giving preclusive effect to findings in a non-appealable contempt order, the trial court concluded that the rulings had been sufficiently firm to have collateral estoppel effect.

¶ 27 Later, in a minute order, the trial court listed the nineteen findings that Elia was collaterally estopped from contesting at trial. In the same order, the court expressly stated that the findings had been conclusively established. Certain evidence Elia tried to present at trial was refused by the trial court because it was being offered to contradict the facts that had been conclusively established in prior proceedings.

¶ 28 The findings became a significant part of Pifer's defense. Pifer's counsel, when delivering his closing argument, was allowed to show the jury the minute entry in which the findings had been enumerated and to advise them that these points had been conclusively established. During jury deliberation, a copy of the minute entry listing the findings that were to have collateral estoppel effect was furnished to the jury upon its request to see it again.

¶ 29 On appeal, Elia's only objection is to the trial court's initial determination to give the findings collateral estoppel effect. He points out that most of the findings at issue here came from an order entered in the domestic relations case in December of 1993, which found Elia in contempt and ordered him jailed. Elia argues that giving the domestic relations findings collateral estoppel effect was error because a contempt order is not a "final judgment" which can be appeal-ed. He does not contest the application of collateral estoppel to the findings that were taken from the bankruptcy judgment because such findings were part of a "final judgment."

■ ¶ 30 We agree that orders adjudicating whether a person should be held in contempt for refusing to obey a court order are not appealable in Arizona. By case law, it has long been held that this kind of contempt order is reviewable in appropriate circumstances by special action, but not by way of appeal. *See, e.g., United Farm Workers Nat'l Union v. Heggblade–Marguleas–Tenneco, Inc.,* 21 Ariz.App. 514, 516, 520 P.2d 1191, 1193 (1974); *Van Baalen v. Superior Court,* 19 Ariz.App. 512, 513, 508 P.2d 771, 772 (1973); *Rogers v. Superior Court,* 4 Ariz. App. 170, 171, 418 P.2d 416, 417 (1966); *Herzog v. Reinhardt,* 2 Ariz.App. 103, 104–05, 406 P.2d 738, 739–40 (1965). The rationale is that parties have already been given the chance to appeal from the order that forms the basis for contempt. Enforcement of such orders cannot be held up by contempt appeals; where review of a contempt order is needed, it must be by the speedier route of special action petition. *Herzog,* 2 Ariz.App. at 104–05, 406 P.2d at 739–40.

¶ 31 Elia points out that Arizona cases repeatedly recite that collateral estoppel is not applicable unless a final judgment was entered. For example, in *Chaney Building Co. v. City of Tucson,* 148 Ariz. 571, 573, 716 P.2d 28, 30 (1986), our supreme court stated, "[c]ollateral estoppel or issue preclusion is applicable when the issue or fact to be litigated was actually litigated in a previous suit, *a final judgment was entered,* and the party against whom the doctrine is to be invoked had a full opportunity to litigate the matter and actually did litigate it, provided such issue or fact was essential to the prior judgment." (Emphasis added.)

¶ 32 Elia argues that the requirement of a "final judgment" means that there must be an appealable judgment. We disagree. Elia has not cited and we have not found any cases showing that the Arizona courts have considered this precise question. The cases he has cited simply do not deal with that issue. *See, e.g., State v. Schallock,* 189 Ariz.

250, 254–55, 941 P.2d 1275, 1279–80 (1997)(collateral estoppel may not be predicated upon a "verdict" upon which no "judgment" is rendered); *City of Glendale v. Aldabbagh*, 189 Ariz. 140, 144, 939 P.2d 418, 422 (1997)(findings at preliminary injunction hearing not sufficient to permit application of collateral estoppel doctrine because case settled instead of going on to the permanent injunction stage with entry of final judgment); *State v. Williams*, 131 Ariz. 211, 213, 639 P.2d 1036, 1038 (1982)(collateral estoppel cannot attach to a verdict but requires a judgment entered by the court upon the verdict).

¶ 33   The position taken by the Restatement (Second) of Judgments (1982) as set forth in section 13 is that "for purposes of issue preclusion (as distinguished from merger and bar), 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect." As explained in comment (a) to section 13, to be given preclusive effect, a judgment must be "a firm and stable one, the 'last word' of the rendering court—a 'final' judgment" as opposed to one that is considered "merely tentative in the very action in which it was rendered." Additionally, although section 28(1) of the Restatement states that preclusion will not be allowed where "[t]he party against whom preclusion is sought could not, as a matter of law, have obtained review of the judgment in the initial action," comment (a) makes it clear that review does not have to be by appeal but can be by extraordinary writ, which in Arizona is "special action" review.

¶ 34   Where we have no pertinent Arizona decisions, this court generally follows the Restatement whenever applicable. *First Nat'l Bank of Ariz. v. Bennett Venture, Ltd.*, 130 Ariz. 562, 563, 637 P.2d 1065, 1066 (App.1981). Because no Arizona case law holding defines "final judgment," for collateral estoppel purposes, contrary to the definition contained in the Restatement (Second) of Judgments, we follow its direction in this case. The availability of special action review precludes Elia from relitigating the issue of contempt.

**C.   Did the trial court err in ruling that by pursuing his malpractice suit against Pifer, Elia waived his attorney-client privilege to exclude testimony concerning communications with his other attorneys, Mothershead and Kalish, that related to defenses Pifer sought to raise?**

¶ 35   The trial court concluded that Elia had impliedly waived the attorney-client privilege as to communications with his later retained attorneys relating to the issue of attacks on or appeal from the decree. The court permitted Pifer to elicit testimony from Elia, Kalish and Mothershead on this limited topic. Elia argues that the trial court erred in making this ruling and that the testimony elicited was prejudicial to him. We disagree. Elia's theory of the case was that he had not agreed to settle his dissolution matter and that he had not been advised of appeal rights. He was not, therefore, entitled to preclude evidence relevant to these matters by asserting the attorney-client privilege.

¶ 36   We begin by observing that Elia's claim of negligence against Pifer clearly placed in issue the communications with his later retained attorneys. If Elia never mentioned to his attorneys that Pifer had settled without his authority, that fact would give rise to an inference that Pifer had not committed malpractice. On the other hand, if Elia had told the attorneys that he had not agreed to the settlement, and they had failed to follow his instruction to attack the decree, they might also have been negligent, thereby reducing Pifer's share of the liability. Thus, the information sought from the attorneys was clearly relevant; the only question is whether it is barred by the attorney-client privilege.

¶ 37   Elia contends that we should follow California law and find that he did not waive the attorney-client privilege. He cites *Miller v. Superior Court*, 111 Cal.App.3d 390, 168 Cal.Rptr. 589, 590 (1980) and *Schlumberger Limited v. Superior Court*, 115 Cal.App.3d 386, 171 Cal.Rptr. 413, 417 (1981). In both those cases, the California appeals court concluded that waiver applied only to communications between the client and the attorney charged with malpractice and not to commu-

nications between the client and other attorneys, even if such communications would be relevant to the issues raised.

■ ¶ 38 Other courts, however, have developed a more liberal approach for determining whether waiver should apply in any particular situation. The test that has been used by some courts to determine whether implied waiver has been made was first enunciated in a federal district court opinion in *Hearn v. Rhay,* 68 F.R.D. 574 (E.D.Wash. 1975). There, the court concluded that when the following three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct: "(1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense." *Id.* at 581. The *Hearn* court explained that "the policy of the privilege is to protect confidential attorney-client relationships only to the extent that the injury the relationship would suffer from disclosure is greater than the benefit to be gained thereby." *Id.* at 582 (citing 8 *Wigmore on Evidence* § 2285, at 527 (1961)).

¶ 39 Although the *Hearn v. Rhay* test has been criticized by some courts, see, e.g., *Smith v. Kavanaugh, Pierson & Talley,* 513 So.2d 1138, 1145 (La.1987), other courts have followed an approach similar to that of *Hearn. E.g., League v. Vanice,* 221 Neb. 34, 374 N.W.2d 849, 856 (1985) (in suit brought by minority shareholder against corporate president for breach of duty regarding various corporate transactions, minority shareholder waived lawyer-client privilege with respect to his knowledge of allegedly improper transactions); *Pappas v. Holloway,* 114 Wash.2d 198, 787 P.2d 30, 36–37 (1990) (in malpractice suit brought by clients against attorney, fairness required waiver of attorney-client privilege as to all attorneys who had been involved in defending clients in underlying litigation).

■ ¶ 40 The trial court concluded that *Pappas v. Holloway,* which followed *Hearn v. Rhay,* was consistent with Arizona law.

We agree. Arizona courts take a "fairness" approach to determining whether implied waiver of the attorney-client privilege should be found in a particular situation. As early as 1963, our supreme court in a case involving physician-patient privilege quoted the following from *Wigmore* with approval:

A waiver is to be predicated not only when the conduct indicates a plain intention to abandon the privilege, but also when the conduct (though not evincing that intention) places the claimant in such a position, with reference to the evidence, that it would be unfair and inconsistent to permit the retention of the privilege. It is not to be both a sword and a shield....

*Throop v. F.E. Young and Co.,* 94 Ariz. 146, 158, 382 P.2d 560, 568 (1963)(quoting 8 *Wigmore on Evidence* § 2388, at 855 (1961)). In *State v. Cuffle,* 171 Ariz. 49, 52, 828 P.2d 773, 776 (1992), where the attorney-client privilege was invoked, our supreme court again stated that a defendant would not be allowed to use privilege as a shield to block inquiry into an issue that he had raised. *See also Ulibarri v. Superior Court,* 184 Ariz. 382, 385, 909 P.2d 449, 452 (App.1995) ("A client ... waives the privilege when her conduct places her in such a position with reference to the evidence that to permit retention of the privilege would be unfair and inconsistent.").

**D. Did the trial court err in refusing to admit certain hearsay testimony from Elia's present wife?**

■ ¶ 41 Elia sought to have his present wife Marlene Elia testify to telephone conversations she had with him when he was in jail for contempt. Elia argued that the testimony should be admitted because it was relevant to prove emotional distress damages that he suffered from being jailed because of Pifer's malpractice. He asserted that the evidence was admissible under the state of mind hearsay exception. The trial court allowed Marlene to testify that Elia had told her that a jail inmate had tried to kill him because he was thought to be a child molester.

■ ¶ 42 The court, however, refused Marlene's testimony on two additional points:

(1) that Elia had telephoned her and told her that inmates tried to make him do drugs and threatened him if he told anyone, and (2) that he was viewed as a potential troublemaker because he had a "green badge" indicating his transfer from a low security facility to Madison jail. The court found that this testimony was cumulative to testimony Elia had already given on those matters and that its relevance was outweighed by potential jury confusion as to how to use the evidence. We find no error. The trial court has discretion in excluding evidence that is cumulative and possibly confusing. *State v. Williams*, 133 Ariz. 220, 231, 650 P.2d 1202, 1213 (1982).

**E. Did the trial court err in granting summary judgment to Pifer's husband, John Pifer, based on a prenuptial agreement they had executed?**

¶ 43  Elia's final argument is that the trial court erred in ruling on summary judgment that a prenuptial agreement executed by Pifer and her husband, John Pifer, insulated John from liability for any damages caused by Pifer's negligence. We reject this argument.

¶ 44  A court ruling on a motion for summary judgment must decide whether the record establishes that no genuine issue of material fact exists and that the moving party is entitled to judgment on the merits as a matter of law. *Orme School v. Reeves*, 166 Ariz. 301, 305, 802 P.2d 1000, 1004 (1990). The appellate court is not bound by the trial court's legal conclusions and may conduct a *de novo* review of legal issues decided on summary judgment. *Libra Group, Inc. v. State*, 167 Ariz. 176, 179, 805 P.2d 409, 412 (App.1991).

¶ 45  Because the premarital agreement was not shown by Elia to be either involuntary or unconscionable, it prospectively abrogated the Pifers' respective rights to claim that property acquired during marriage was community property. Consequently, all property acquired by John Pifer after marriage was his separate property and not subject to Elia's claims against Stacy Pifer.

¶ 46  We agree with Elia that all property acquired during marriage is presumed to be community property, *see American Express Travel Related Services Co. v.* *Parmeter*, 186 Ariz. 652, 653, 925 P.2d 1369, 1370 (App.1996), Arizona Revised Statutes Annotated ("A.R.S.") section 25–211 (1991), and that community property can be reached by creditors to satisfy a community debt. A.R.S. § 25–215(D)(1991). The parties may, however, enter into a premarital agreement prospectively abrogating their respective rights to community property. *Spector v. Spector*, 23 Ariz.App. 131, 138, 531 P.2d 176, 183 (1975). To be valid, the premarital agreement must have been contracted voluntarily and must not have been unconscionable when executed. A.R.S. § 25–202(C)(Supp.1997).

¶ 47  On its face, the agreement is neither involuntary nor unconscionable. First, the agreement is acknowledged and signed by both parties. Second, it provides that "the parties have made a full, fair and complete disclosure of the extent and value of all their property, debts, estate and expectancies." Additionally, the parties each attached to the agreement a detailed list of their assets together with the asset values. Finally, the parties acknowledge that they have been advised by, or have had "ample" opportunity to retain, separate legal counsel.

¶ 48  The agreement establishes prima facie that the parties effectively abrogated all community property rights that either party would ordinarily have under section 25–211. *See United Bank v. Allyn*, 167 Ariz. 191, 196, 805 P.2d 1012, 1017 (App.1990). To prevent the entry of summary judgment, Elia was required to respond with specific facts attacking the validity of the agreement and showing that there was a genuine issue for trial. *Id.* Having failed to do so, the trial court properly entered summary judgment that the agreement was valid.

¶ 49  Elia argued in the trial court, and argues here, that even if the prenuptial agreement were valid, Pifer has failed to show that the agreement is binding upon a tort creditor of the community. The Arizona statute provides, however, that the separate property of one spouse "shall not be liable for the separate debts or obligations of the other spouse, absent agreement of the property owner to the contrary." A.R.S. § 25–215. We find nothing in the statute indicat-

ing that the legislature intended to make any distinction between debts arising from contract and those rooted in a tort claim. Consequently, we conclude that the separate property of a spouse is immune from liability for separate debts or obligations of the other spouse arising from both tort and contract.

¶ 50  Furthermore, in *Bachrach v. Stark*, 11 Ariz.App. 376, 464 P.2d 822 (1970), we previously rejected an argument similar to the argument made by Elia in this case. There, eight months before husband left wife, they entered into a property settlement agreement changing the status of their property from community to separate. *Id.* at 377, 464 P.2d at 823. After the agreement was made, but during the marriage, husband's attorney rendered legal services for wife at the request of husband. After husband died, husband's attorney brought an action against wife to recover for the services rendered to wife. The *Bachrach* court held that because the agreement eliminated any community property held by the couple, the debts incurred by the husband were personal debts. *Id.* The husband's attorney was therefore unable to subject the separate property of the wife to a claim for the value of his legal services.

■ ¶ 51  Although the present case involves a premarital agreement rather than a property settlement made during marriage, we find no reason to treat them differently. We therefore conclude that a valid premarital agreement abrogating community property rights precludes a creditor of one spouse from proceeding against the separate property of the other spouse on a claim arising during marriage. In this, we are supported by at least one other court. A California appeals court has held that a premarital agreement that transmutes what would be presumed community property into separate property is effective to bar claims by a creditor against a spouse who did not contract with the creditor. *Leasefirst v. Borrelli*, 13 Cal.App.4th Supp. 28, 17 Cal.Rptr.2d 114, 115–16 (1993).

¶ 52  Finally, Elia argues that the agreement does not provide that the earnings of John Pifer were to be separate property. We disagree for several reasons. First, the language of the agreement indicates that the parties clearly intended that John Pifer's earnings would not be subject to claims made against Stacy Pifer.[2] Furthermore, in the agreement the parties specifically state that they desire to "waive all specific community property claims or offsets that each could conceivably have in the property of the other as a incident of the marriage relationship." According to the affidavits filed in support of Pifer's motion for summary judgment, all property owned by each party and the income from such property was listed in the exhibits attached to the pre-marital agreement. Thus, each of the parties to the agreement waived any claim that any income from any of the listed property was community property.

¶ 53  In the absence of evidence that the Pifers later acquired income-producing assets that were not listed in the agreement and that presumptively would be community property, no community existed against which Elia could assert a claim. The trial court properly granted summary judgment for Stacy Pifer on the issue of John Pifer's liability.

## III.  CONCLUSION

¶ 54  For the reasons explained in this decision, we reverse and remand this case to the superior court for proceedings consistent with this decision.

SUSAN A. EHRLICH, Presiding Judge, and THOMAS C. KLEINSCHMIDT, Judge, concur.

---

**2.**  The agreement provides, "[n]either party shall be liable in any manner for actual or punitive damages, attorney's fees or costs, or claims of any kind which arise in any way from the other's business or professional dealings."