884 P.2d 259

**ST. LUKE'S HEALTH SYSTEM, an Arizona nonprofit corporation, dba St. Luke's Medical Center and Mary Starmann–Harrison, Plaintiffs–Appellants, Cross Appellees,**

v.

**STATE of Arizona, DEPARTMENT OF LAW, CIVIL RIGHTS DIVISION, Defendant–Appellee, Cross Appellant.**

No. 1 CA–CV 92–176.

Court of Appeals of Arizona, Division 1, Department B.

Oct. 25, 1994.

Mariscal, Weeks, McIntyre & Friedlander, P.A. by Gerald K. Gaffaney, Anne L. Tiffen, Phoenix, for plaintiffs-appellants/cross-appellees.

Grant Woods, Atty. Gen. by Judy Drickey–Prohow, Civ. Rights Div., Tucson, for defendant-appellee/cross-appellant.

Lewis & Roca by Susan M. Freeman, Karen Carter Owens, Alexandra M. Shafer,

Phoenix, for amicus curiae, Arizona Hosp. Ass'n.

Layton E. Olson, Chicago, IL, for amici curiae, American College of Intern. Physicians, Inc. and Liberty for American Minority Physicians, Inc.

## OPINION

TOCI, Judge.

Dr. Aldemir Coehlo, M.D. ("Dr. Coehlo") filed an employment discrimination charge against St. Luke's Medical Center ("St. Luke's") after St. Luke's suspended his medical staff privileges because he refused to submit his surgical cases to a medical staff peer review committee. Dr. Coehlo, a native of Brazil, alleged that St. Luke's suspended him because of his national origin, in violation of the Arizona Civil Rights Act ("ACRA"). When the Arizona Civil Rights Division ("Division") subpoenaed St. Luke's medical staff peer review materials, St. Luke's refused to comply. Instead, St. Luke's filed a complaint for declaratory relief, asserting that the Division had no jurisdiction to conduct an investigation because St. Luke's and Dr. Coehlo did not have an employment relationship. The trial court granted summary judgment against St. Luke's on this issue.

■ We hold that Dr. Coehlo was not an employee of St. Luke's, as that term is defined in the ACRA. Accordingly, Dr. Coehlo's discrimination charge did not give the Division jurisdiction under the ACRA to conduct an investigation of St. Luke's peer review process. Because the absence of an employment relationship barred the Division from investigating Dr. Coehlo's discrimination charge, we need not determine if a peer review privilege under Ariz.Rev.Stat.Ann. ("A.R.S.") section 36–445.01 (1993) precluded the Division from obtaining St. Luke's peer review materials. Thus, we reverse the trial court's grant of summary judgment against St. Luke's.

## I. FACTUAL AND PROCEDURAL HISTORY

St. Luke's medical staff consists of Arizona licensed physicians to whom the hospital has granted the privilege of staff membership. Staff physicians are permitted to use St. Luke's facilities to provide medical care for their patients. Although staff physicians must comply with St. Luke's standards of performance, each physician determines the proper course of treatment for his or her patients. St. Luke's does not generally supervise the details of a staff physician's medical practice. Further, staff physicians do not receive any payment or fringe benefits from St. Luke's; they are paid for their services directly by their patients or their patients' insurers.

St. Luke's medical staff is divided into several departments according to areas of specialty. Each department is managed by a committee composed of department members, including the chairman and vice-chairman of the department. As required by A.R.S. section 36–445 (Supp.1993), the department committees review and evaluate the quality of medical care provided by each staff physician in the department. Under St. Luke's bylaws, the chief executive officer is authorized to suspend a physician's staff privileges "whenever there is reason to believe that such action should be taken immediately in the best interest of patient care in the Hospital."

Dr. Coehlo joined the medical staff of the Department of Cardiovascular and Thoracic Surgery in 1983. In July 1989, because of specific concerns regarding the quality of Dr. Coehlo's patient care, the Cardiovascular and Thoracic Surgery Committee directed Dr. Coehlo to submit to a review of his next twenty surgical cases. Dr. Coehlo, however, refused to comply with the Committee's request. St. Luke's then summarily suspended Dr. Coehlo's staff privileges.[1]

Dr. Coehlo, a native of Brazil, filed an employment discrimination charge under the ACRA against St. Luke's. The complaint alleged that St. Luke's suspended his hospi-

---

1. In February 1990, Dr. Coehlo agreed to submit to the Committee's review, and St. Luke's lifted the suspension.

tal staff privileges because of his national origin. The Division investigated the charge and served St. Luke's with a subpoena requesting, among other things, information related to St. Luke's peer review process. St. Luke's petitioned the Division to revoke or modify the subpoena, but the Division summarily denied the petition.

St. Luke's then filed a declaratory judgment action in Maricopa County Superior Court against the Division. The complaint alleged first that the hospital was immune from any civil liability arising from its peer review process. Second, St. Luke's asserted that because no employment relationship existed between St. Luke's and Dr. Coehlo, the Division lacked jurisdiction to investigate the alleged discriminatory actions.

The parties filed cross-motions for summary judgment. The trial court found that Dr. Coehlo and St. Luke's did have an employment relationship under the ACRA, and granted summary judgment in favor of the Division on the employment issue. The trial court also found, however, that the subpoenaed peer review materials were privileged from disclosure by A.R.S. section 36–445.01 (Supp.1993). Thus, the trial court granted summary judgment in favor of St. Luke's on the latter issue.

The parties filed motions for reconsideration. The Division filed a motion for reconsideration on the peer review issue, which the trial court denied. St. Luke's filed a cross-motion for reconsideration on the employment issue and in it argued its immunity defense for the first time. The trial judge summarily denied St. Luke's cross-motion for reconsideration without addressing the merits of the immunity issue. Both parties appeal.

## II. STANDARD OF REVIEW

■ The material facts of this case are not in dispute; rather, the parties only dispute the meaning and proper application of A.R.S. sections 41–1463 and 36–445 *et seq.* When reviewing a grant of summary judgment on undisputed facts, our role is to determine whether the trial court correctly applied the substantive law to these facts. *Miller· v.*

*Westcor Ltd. Partnership,* 171 Ariz. 387, 390, 831 P.2d 386, 389 (App.1991).

## III. DISCUSSION

### A. Application of the ACRA to St. Luke's

The fundamental issue is this: does a physician's hospital staff membership and use of hospital facilities, without more, create an employment relationship with the hospital that is governed by the ACRA?

Applying what has been designated as the "hybrid" test of employment, we conclude that Dr. Coehlo was not St. Luke's employee. St. Luke's did not pay Dr. Coehlo a salary or, aside from staff membership, provide him any benefits. Although St. Luke's provided the facility, equipment, and support staff used by Dr. Coehlo, and imposed standards upon him because of his staff privileges, St. Luke's did not control the manner or means by which he rendered medical care to his patients.

We begin our discussion of this issue by analyzing the applicable ACRA provisions. A.R.S. section 41–1463(B)(1) (1992) states that it is an unlawful employment practice for an employer:

> To fail or refuse to hire or to discharge any individual or otherwise to discriminate against any individual with respect to his compensation, terms, conditions or privileges of employment because of such individual's race, color, religion, sex, age, handicap or *national origin.*

(Emphasis added). Although the ACRA prohibits employment discrimination on the basis of national origin, it does not clearly define what constitutes an employment relationship. The ACRA defines "employee" as "an individual employed by an employer." A.R.S. section 41–1461(1) (1992). "Employer" is defined as a "person who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, and any agent of such person." A.R.S. section 41–1461(2) (1992). Because these circular definitions do not tell us whether Dr. Coehlo was an employee of St. Luke's, the ACRA provides us with little guidance. Further, no

Arizona cases have squarely addressed this issue.

■ Because Arizona law does not resolve this issue, we will consider similar federal case law. The ACRA is generally similar in both intent and purpose to the federal employment discrimination laws, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. section 2000e (1988), and the Rehabilitation Act of 1973 ("Rehabilitation Act"), as amended, 29 U.S.C. sections 701–797b (Supp. 1993). *See Bogue v. Better–Bilt Aluminum Co.*, 179 Ariz. 22, 27, 875 P.2d 1327, 1332 (App.1994); *Matos v. City of Phoenix*, 176 Ariz. 125, 128, 859 P.2d 748, 751 (App.1993); *Timmons v. City of Tucson*, 171 Ariz. 350, 354, 830 P.2d 871, 875 (App.1991). Accordingly, "unless the federal law exceeds the scope of the ACRA, we look to federal case law for guidance in this area." *Bogue*, 179 Ariz. at 27, 875 P.2d at 1332; *Matos*, 176 Ariz. at 128, 859 P.2d at 751; *see also Higdon v. Evergreen Int'l Airlines, Inc.*, 138 Ariz. 163, 165–66 n. 3, 673 P.2d 907, 909–10 n. 3 (1983).

■ Federal courts have considered three different tests to determine whether an employment relationship exists for purposes of federal anti-discrimination legislation. *Mares v. Marsh*, 777 F.2d 1066, 1067 (5th Cir.1985). The first test is the traditional common law test of agency, which turns on the employer's right to control. *Id.* Under this test, an employer is the person who hires the worker, pays wages, has the power to terminate the employment relationship, and furnishes the tools and workplace. *Tarboro v. Reading Co.*, 396 F.2d 941, 943 (3d Cir. 1968), *cert. denied*, 393 U.S. 1027, 89 S.Ct. 637, 21 L.Ed.2d 569 (1969). The common law agency test, however, "generally has not been applied to federal social welfare and

anti-discrimination legislation, since it is considered inconsistent with the remedial purposes behind such legislation." *Mares*, 777 F.2d at 1067 n. 1.

■ The common law agency test was replaced in Fair Labor and Standards Act cases by an "economic realities" test. *Id.* at 1067.[2] Under this test, "employees" are persons who " 'as a matter of economic reality are dependent upon the business to which they render service.' " *Lauritzen*, 835 F.2d at 1534 (quoting *Mednick*, 508 F.2d at 299 (quoting *Bartels*, 332 U.S. at 130, 67 S.Ct. at 1549–50)). Instead of focusing on the employer's right to control, this test focuses on whether the individual is dependent on the putative employer's business for his continued employment and livelihood. *See Lauritzen*, 835 F.2d at 1538. Thus, the economic realities test applies to a broader range of "employment relationships" than the more restrictive common law test of agency.

■ The third test is a hybrid of the common law test of agency and the economic realities test.[3] In applying this test, courts consider the economic realities of the work relationship but focus primarily on "[t]he extent of the employer's right to control the means and manner of the worker's performance." *Lutcher*, 633 F.2d at 883. Thus, if "an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved," an employment relationship probably exists. *Spirides*, 613 F.2d at 831–32. Additionally, the following factors are considered:

(1) the kind of occupation, with reference to whether the work usually is done under the direction of a supervisor or is done by a specialist without supervision; (2) the skill required in the particular occupation;

---

**2.** *See Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947); *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947); *Secretary of Labor, United States Dep't of Labor v. Lauritzen*, 835 F.2d 1529, 1534 (7th Cir.1987), *cert. denied*, 488 U.S. 898, 109 S.Ct. 243, 102 L.Ed.2d 232 (1988); *Armbruster v. Quinn*, 711 F.2d 1332 (6th Cir. 1983); *Mednick v. Albert Enters., Inc.*, 508 F.2d 297 (5th Cir.1975).

**3.** *Mitchell v. Frank R. Howard Mem. Hosp.*, 853 F.2d 762, 766 (9th Cir.1988), *cert. denied*, 489 U.S. 1013, 109 S.Ct. 1123, 103 L.Ed.2d 186 (1989); *Diggs v. Harris Hosp.–Methodist, Inc.*, 847 F.2d 270, 272 (5th Cir.1988), *cert. denied*, 488 U.S. 956, 109 S.Ct. 394, 102 L.Ed.2d 383 (1988); *Lutcher v. Musicians Union Local 47*, 633 F.2d 880, 883 (9th Cir.1980); *Spirides v. Reinhardt*, 613 F.2d 826, 831 (D.C.Cir.1979); *Beverley v. Douglas*, 591 F.Supp. 1321 (S.D.N.Y. 1984).

(3) whether the "employer" or the individual in question furnishes the equipment used and the place of work; (4) the length of time during which the individual has worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i.e. by one or both parties, with or without notice and explanation; (7) whether annual leave is afforded; (8) whether the work is an integral part of the business of the "employer"; (9) whether the work accumulates retirement benefits; (10) whether the "employer" pays social security taxes; and (11) the intention of the parties.

*Lutcher*, 633 F.2d at 883 n. 5 (quoting *Spirides*, 613 F.2d at 832).

█ In our view, the hybrid test is the most reasonable and workable test. Because the common law test of agency turns on the alleged employer's right to control, we find the common law test too restrictive to properly identify an employment relationship in these circumstances. We also conclude that application of the economic realities test, which essentially ignores the alleged employer's right to control, would transform many independent contractor relationships into employment relationships. Further, the Ninth Circuit has adopted and applied the hybrid test. *See Lutcher*, 633 F.2d 880. Consequently, we adopt the hybrid test to determine whether, under the ACRA, an employment relationship existed between St. Luke's and Dr. Coehlo.

Applying the hybrid test to this case, we conclude that Dr. Coehlo was not an employee of St. Luke's. Dr. Coehlo is a highly skilled cardiovascular and thoracic surgeon with staff privileges at several Phoenix hospitals. Although St. Luke's furnished the facility, equipment, and support staff used by Dr. Coehlo, St. Luke's did not control the details of his medical practice. Dr. Coehlo independently admitted his own patients, diagnosed their conditions, and determined the appropriate manner and means of treatment. St. Luke's did not pay Dr. Coehlo a salary; rather, he was paid directly by his patients or their insurers. Further, no evidence exists in this record that St. Luke's paid Dr.

Coehlo's social security taxes, afforded him annual leave, or provided him retirement benefits.

Our conclusion is supported by the Fifth Circuit's decision in *Diggs v. Harris Hospital–Methodist, Inc.*, cited above. There, Jacquelyn Diggs, an African American female physician, brought a Title VII suit against the hospital that terminated her staff privileges. 847 F.2d at 271. After a bench trial, the district court found that Dr. Diggs lacked the capacity to sue under Title VII because she was not an employee of the hospital. *Id.* On appeal, the Fifth Circuit, applying the hybrid test, agreed with the district court that Dr. Diggs was not an employee of the hospital:

> While the hospital supplied the tools, staff and equipment utilized by Diggs in delivering medical care at the hospital, and while it imposes standards upon those permitted to hold staff privileges, the hospital does not direct the manner or means by which Diggs renders medical care. Diggs is under no duty to admit any of her patients to Harris Hospital, and Harris Hospital does not pay her for her services.
>
> Diggs treated her patients in Harris Hospital without direct supervision.... The hospital does not provide salary or wages to physicians with staff privileges, nor does it pay their licensing fees, professional dues, insurances, taxes, or retirement benefits. Diggs had staff privileges at several other Fort Worth area hospitals during the time she was on Harris Hospital's provisional staff.

*Id.* at 273. Because the facts in *Diggs* are nearly identical to those in the present case, we find *Diggs* persuasive.

Additionally, the Ninth Circuit's decision in *Mitchell v. Frank R. Howard Memorial Hospital* supports our conclusion. There, Dr. Winston A. Mitchell, a member of the Mormon church, had an oral contract to provide radiology services to Howard Hospital. 853 F.2d at 763. The hospital terminated its agreement with Dr. Mitchell and entered into an exclusive contract for hospital-based radiology services with another radiologist. *Id.* Dr. Mitchell sued the hospital under Title VII, claiming that it discriminated against

him because of his religion. *Id.* The district court dismissed his claim with prejudice, finding that he did not have a Title VII protected employment relationship with the hospital. *Id.* at 763–64.

On appeal, the Ninth Circuit applied the hybrid test and reversed the dismissal. *Id.* at 767. The court found that the facts alleged in Mitchell's complaint might have supported a claim under Title VII:

> Dr. Mitchell alleges that all radiology services were provided at the Hospital, and that at least some of the equipment used was provided by the Hospital. Moreover, and perhaps more important, Dr. Mitchell alleges that his agreement with the Hospital provided that he would treat Hospital patients; he does not allege that he used the Hospital facilities to treat his own patients. In addition, Dr. Mitchell alleges that his agreement with the Hospital provided that he would receive in compensation for his services forty percent of the gross billings of the radiology department during the time the agreement was in effect. . . . *[T]he fact that Dr. Mitchell was paid by the Hospital rather than by the patients he treated may very well support his position.*

*Mitchell,* 853 F.2d at 766–67 (citations omitted) (emphasis added). *Mitchell* implicitly suggests that a staff physician does not have an employment relationship with a hospital unless the physician, at minimum, provides services to the hospital in exchange for compensation from the hospital. Consequently, under this approach, Dr. Coehlo and St. Luke's did not have an employment relationship.

The Division argues, however, that St. Luke's exercised ultimate control over Dr. Coehlo because it had the power to suspend his staff privileges. We disagree. Under the hybrid test, control means that the employer has the "right to control the details and means by which the work is to be performed." *Diggs,* 847 F.2d at 272. Here, Dr. Coehlo independently controlled the details and means by which he practiced medicine. He admitted his patients, diagnosed their conditions, and determined the appropriate manner of treatment. Further, because Dr.

Coehlo had staff privileges at other Phoenix hospitals, he did not depend on privileges at St. Luke's for continuing his medical practice. Under the hybrid test, St. Luke's did not "control" Dr. Coehlo's medical practice.

The Division also contends that by furnishing Dr. Coehlo with the facility, equipment, and support staff needed for his practice, St. Luke's compensated him. Therefore, according to the Division, he is an employee. We disagree. The Division does not cite, and we have not found, any authority to support this proposition. Although St. Luke's may, by furnishing the surgical facilities to Dr. Coehlo, provide Dr. Coehlo an incentive for using St. Luke's facilities to treat his patients, such an incentive does not compensate him for the services he provides his patients. Those services are paid for by Dr. Coehlo's patients, not St. Luke's.

Additionally, the Division contends that St. Luke's violated section 41–1463(B)(1) of the ACRA by denying Dr. Coehlo access to employment opportunities with other health care providers. The Division points out that A.R.S. section 41–1463(B)(1) prohibits employers from discriminating against "any *individual* with respect to his compensation, terms, conditions or privileges of employment. . . ." (Emphasis added). The Division relies on federal cases that have interpreted this language to prohibit discrimination that interferes with one's "employment relationships." *See, e.g., Diggs,* 847 F.2d at 273. Nevertheless, we reject the Division's argument because the Division has not made the showing necessary to establish interference with an "employment opportunity" as defined by the federal courts.

In *Mitchell,* the Ninth Circuit held that to maintain a claim that the defendant's actions interfered " 'with an individual's employment opportunities with another employer,' " a plaintiff must show a connection with an employment relationship between plaintiff and the other employer. *Mitchell,* 853 F.2d at 767 (quoting *Lutcher,* 633 F.2d at 883 n. 3). *Diggs* added that these "employment opportunities" must constitute "employment relationships" under the hybrid test. 847 F.2d at 274. In other words, an employment opportunity cannot exist unless, under the

hybrid test, an individual has an employment relationship with another employer.

Here, the Division argues that the suspension "realistically would impede, if not bar outright, Coehlo's opportunities to obtain employment with other medical practitioners and facilities." The Division, however, does not contend that the suspension interfered with Dr. Coehlo's employment opportunities with any specific health care provider. And, the Division does not establish that any of these "opportunities" with other health care providers would qualify as an employment relationship under the hybrid test. Consequently, there is no merit to the Division's argument that St. Luke's interfered with Dr. Coehlo's "employment opportunities."

### B. The Immunity Issue

St. Luke's motion for summary judgment failed to raise the issue that the peer review statutes grant immunity under the ACRA to St. Luke's. "Generally, a party may not advance a new theory on appeal to secure a reversal of the trial court's judgment." *Brown v. Arizona Pub. Serv. Co.*, 164 Ariz. 4, 6, 790 P.2d 290, 292 (App.1990). For this reason, and because we hold that Dr. Coehlo was not an employee of St. Luke's, we do not consider the immunity issue raised in St. Luke's opening brief.

### IV. CONCLUSION

We hold that because Dr. Coehlo did not have an employment relationship with St. Luke's governed by the ACRA, the Division lacked jurisdiction to conduct an investigation. Thus, we affirm the summary judgment in favor of St. Luke's and reverse the summary judgment in favor of the Division.

WEISBERG, P.J., and CONTRERAS, J., concur.