8 P.3d 1163

**Rick and Joyce LINGEL, husband and wife, Plaintiffs/Appellants,**

v.

**Michael and Patricia OLBIN, husband and wife, Defendants/Appellees.**

**No. 2 CA–CV 99–0061.**

Court of Appeals of Arizona, Division 2, Department B.

Aug. 29, 2000.

Review Denied Feb. 13, 2001.*

* Chief Justice Zlaket and Justice Feldman voted to grant review.

**250**

Gabroy, Rollman & Bossé, P.C., By John Gabroy, Tucson, for Plaintiffs/Appellants.

Fines & Oden, P.L.C., By L. Anthony Fines, Tucson, for Defendants/Appellees.

## O P I N I O N

ESPINOSA, Chief Judge.

¶ 1 Plaintiffs/appellants Rick and Joyce Lingel appeal from the trial court's order granting summary judgment in favor of defendants/appellees Patricia and Michael Olbin in the Lingels' breach of contract action, which claimed entitlement to one-half of any proceeds recovered in the Olbins' wrongful death action for the death of Erik Olbin, the biological son of Patricia Olbin and Rick Lingel. The Lingels argue that the trial court erred in refusing to enforce the parties' agreement to share the proceeds of the wrongful death claim as well as contractual proceeds from an automobile insurance policy, finding both subject to the rule against assignment of personal injury claims. For the reasons set forth below, we conclude that such agreements are not enforceable in Arizona and, therefore, we affirm.

### Facts and Procedural History

¶ 2 We view the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion below. *Hill–Shafer Partnership v. Chilson Family Trust*, 165 Ariz. 469, 799 P.2d 810 (1990). The material facts are largely undisputed. As noted above, Erik Olbin was the natural child of Patricia Olbin and Rick Lingel. After Rick and Patricia divorced, Rick relinquished his parental rights to Erik, and Patricia's new husband, Michael, adopted him. In May 1997, Erik was killed in a traffic accident at the age of twenty-four.

Shortly thereafter, the Lingels and the Olbins entered into "an oral contract" in which they agreed to share equally Erik's estate, any insurance benefits "relating to Erik's death," and proceeds from any wrongful death action. An attorney friend of the Lingels, who had represented Erik in another matter, was present for this discussion. Rick later asked Michael to confirm the agreement in writing, which he did. Acting on the Olbins' desire "to get things moving," Rick brought a wrongful death action as Erik's "surviving father" against the driver who had struck and killed Erik, seeking to recover his damages for lost consortium, burial expenses, and other items.[1] The Olbins' attorney subsequently advised them that the Lingels had no right to recover for Erik's death and, at the Olbins' request, informed the Lingels they would not be sharing in Erik's estate or "any wrongful death recovery." The Olbins' attorney secured settlements against the driver and his insurance company and recovered underinsured motorist (UIM) benefits from an automobile insurance policy purchased by the Lingels that had covered Erik at the time of the accident. The Olbins also brought a wrongful death action against Pima County based on negligent road design.[2]

¶ 3 The Lingels sued the Olbins, alleging claims of breach of contract and breach of the covenant of good faith and fair dealing. The Olbins filed a counterclaim, seeking the return of money they had paid the Lingels and certain items in Erik's estate. The Olbins also filed a third-party complaint against the Lingels' attorney friend for breach of fiduciary duty, alleging he had led the Olbins to believe he would "protect their interests." The Olbins further alleged the attorney had erroneously advised them about the necessity of having a personal representative appointed for Erik's estate[3] and about the Lingels'

standing to file a wrongful death action and to inherit from the estate.

¶ 4 In their motion for partial summary judgment, the Olbins argued that a contract assigning a wrongful death action and all proceeds therefrom is not enforceable; that the purported agreement with the Lingels violated the statute of frauds; and that Rick Lingel, as the personal representative of Erik's estate, had breached his fiduciary duty to them. In opposition, the Lingels argued that the rule prohibiting the assignment of personal injury claims does not apply to wrongful death claims and any resulting proceeds, that the contract claims for UIM benefits and life insurance benefits were fully assignable as well as severable, that the statute of frauds was inapplicable, and that a material question of fact existed as to whether Rick had violated any duty he owed the Olbins. In their cross-motion for partial summary judgment, the Lingels contended there was no triable issue of fact about the enforceability of their agreement "to equally share all insurance benefits." The trial court granted the Olbins' motion, finding the common law rule prohibiting the assignment of personal injury claims and the proceeds therefrom applicable to actions for wrongful death and any resulting proceeds. The court also found that genuine issues of material fact existed as to whether the entire agreement was void, whether the parties must return life insurance proceeds they had already exchanged, and whether the Lingels were required to return items from Erik's estate.[4] The trial court agreed that the contract claim for life insurance benefits was severable, but denied the remainder of the Lingels' motion, stating:

> [T]he fact that the claim(s) were paid from a liability policy of [the driver] and an underinsured policy covering [Erik] is irrelevant and has no effect on the nonassignability of the claims. . . . The sole

---

1. It is not apparent from the record what became of Rick's wrongful death action.

2. The record suggests that the Olbins did not file a complaint against the driver, and that the action filed against Pima County was resolved by a settlement.

3. Rick Lingel obtained appointment as personal representative of Erik's estate within a week of Erik's death, apparently on the advice of the attorney and, allegedly, notwithstanding the estate's qualifying for summary administration pursuant to A.R.S. §§ 14–3971 to 14–3974.

4. These rulings are not at issue in this appeal.

issues for trial concerning insurance policy assignments are the assignments of life insurance policies and how those assignments were obtained.

Pursuant to Rule 54(b), Ariz. R. Civ. P., 16 A.R.S., the trial court entered judgment in favor of the Olbins, and this appeal followed.

## Standard of Review

■ ¶ 5 In ruling on a motion for summary judgment, a trial court must decide whether a genuine issue of material fact exists and whether the moving party is entitled to judgment on the merits as a matter of law. Ariz. R. Civ. P. 56(c), 16 A.R.S.; *Orme School v. Reeves*, 166 Ariz. 301, 802 P.2d 1000 (1990). In reviewing the ruling, we "determine whether the trial court correctly applied the substantive law to [the] facts." *St. Luke's Health Sys. v. State*, 180 Ariz. 373, 376, 884 P.2d 259, 262 (App.1994). We are not bound by the trial court's legal conclusions and review those questions *de novo*. *Elia v. Pifer*, 194 Ariz. 74, 977 P.2d 796 (App.1998).

## Assignment of Wrongful Death Actions

■ ¶ 6 It is well established in Arizona, and the Lingels acknowledge that, absent statutory authorization, an assignment of a cause of action for personal injuries against a third-party tortfeasor is void and unenforceable. *Allstate Ins. Co. v. Druke*, 118 Ariz. 301, 576 P.2d 489 (1978); *State Farm Fire & Cas. Co. v. Knapp*, 107 Ariz. 184, 484 P.2d 180 (1971); *Lo Piano v. Hunter*, 173 Ariz. 172, 840 P.2d 1037 (App.1992). The Lingels contend, however, that the trial court improperly expanded existing law in concluding that "*any* agreement made by a personal injury or wrongful death plaintiff to pay another person part of the proceeds of a personal injury or wrongful death action is unenforceable in Arizona." To determine whether proceeds of a wrongful death action are assignable, we first consider whether the underlying action itself may be assigned, examining the history and rationale of the rule prohibiting the assignment of claims for personal injury.

No Arizona court has directly addressed this question.

¶ 7 Historically, the assignment of tort actions for personal injuries has been prohibited because, among other reasons, such actions do not survive the death of the injured person in the absence of statute. *See Karp v. Speizer*, 132 Ariz. 599, 647 P.2d 1197 (App. 1982); *Harleysville Mut. Ins. Co. v. Lea*, 2 Ariz.App. 538, 410 P.2d 495 (1966); *see also Liberty Mut. Ins. Co. v. Thunderbird Bank*, 113 Ariz. 375, 555 P.2d 333 (1976) (generally, claims that survive the plaintiff's death are assignable). The Lingels argue that because an action for wrongful death is a statutory, as opposed to common law, cause of action, A.R.S. §§ 12–611 to 12–613, it necessarily survives the death of the person entitled to assert it as a property right and is therefore "freely assignable," citing several cases from other jurisdictions. We note that none of those cases involves wrongful death actions and some offer slim support for the Lingel's theory.[5] After examining our own statutes and precedents, we reject their argument for several reasons.

■ ¶ 8 First, in Arizona, whether a claim is statutory is not determinative of its assignability or survivability. As the Olbins point out, the question of whether a claim survives a person's death is answered by Arizona's survival statute, A.R.S. § 14–3110. That statute provides:

> Every cause of action, except a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive the death of the person entitled thereto or liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed.

In their action for the wrongful death of their adult son, the Olbins apparently asserted

---

5. *See Forgione v. Dennis Pirtle Agency Inc.*, 701 So.2d 557 (Fla.1997); *Black v. First Interstate Bank of Fort Dodge, Iowa*, 439 N.W.2d 647 (Iowa 1989); *Larabee v. Potvin Lumber Co.*, 390 Mass. 636, 459 N.E.2d 93 (1983); *Luker v. Arnold*, 843 S.W.2d 108 (Tex.App.1992); *McKay v. Citizens Rapid Transit Co.*, 190 Va. 851, 59 S.E.2d 121 (1950).

only a claim for "loss of consortium."[6] But, under § 14–3110, a claim for loss of consortium does not survive the death of the person entitled to assert it. Thus, under the rationale of *Harleysville*, that claim could not be assigned. *Cf. Badia v. City of Casa Grande*, 195 Ariz. 349, 988 P.2d 134 (App.1999) (pursuant to § 14–3110, damages for plaintiff's pain and suffering did not survive her death from unrelated injuries); *Katz v. Filandro*, 153 Ariz. 601, 739 P.2d 822 (App.1987) (because claim for loss of economic support upon death of child is not specifically excluded by survival statute, it survived mother's death as property right). And, even if the Olbins' claim or any portion of it did survive, that would not necessarily make it assignable. Section 14–3110 makes no mention of assignability and, for those claims that do survive, only permits the personal representative of the decedent to assert the claim.

¶ 9 Second, as the Lingels correctly note, a cause of action for wrongful death is purely statutory. Under the terms of Arizona's wrongful death act, such an action can only be brought in the names of the categories of persons specifically listed in § 12–612. *Solomon v. Harman*, 107 Ariz. 426, 489 P.2d 236 (1971); *Knauss v. DND Neffson Co.*, 192 Ariz. 192, 963 P.2d 271 (App.1997). In *Mayo v. White*, 178 Cal.App.3d 1083, 224 Cal.Rptr. 373, 377 (1986), the California Court of Appeals held, based on California's wrongful death statute which also limits those who can assert such claims: "[A] cause of action for wrongful death is personal to those persons authorized to maintain the suit under the statute and may not be assigned." *See also Clar v. Dade County*, 116 So.2d 34 (Fla.App. 1959); *Regie de l'assurance Automobile du Quebec v. Jensen*, 399 N.W.2d 85 (Minn. 1987). The Lingels generally do not fall within any of the categories of persons set forth in § 12–612.[7]

¶ 10 Finally, "even though a cause of action for personal injury may survive, an action still may not be assignable either in whole or in part prior to judgment." *Harleysville*, 2 Ariz.App. at 541, 410 P.2d at 498. The prohibition against the assignment of personal injury claims is based on public policy, such as avoiding "the dangers of maintenance and champerty." *Karp*, 132 Ariz. at 601, 647 P.2d at 1199.[8] Courts that have refused to enforce champertous agreements have found the dangers to include multitudinous and useless litigation, speculation and gambling in lawsuits, and the annoyance and harassment of those who are already suffering. *See Wilson v. Harris*, 688 So.2d 265 (Ala.Civ.App.1996); *Berlin v. Nathan*, 64 Ill.App.3d 940, 21 Ill.Dec. 682, 381 N.E.2d 1367 (1978); *see also Hackett v. Hammel*, 185 Minn. 387, 241 N.W. 68, 69 (1932) ("The element of intrusion for the purpose of mere speculation in the troubles of others introduces the vice fatal to what otherwise would be a contract."). There is a risk that "unscrupulous people would purchase causes of action and thereby traffic in lawsuits for pain and suffering." *Harleysville*, 2 Ariz.App. at 541, 410 P.2d at 498; *see also Lo Piano*.

¶ 11 These same concerns arise in the wrongful death context. *See Jensen* (reasons prohibiting assignment of personal injury actions, increased risk of promoting maintenance and champerty, also exist with assignments of wrongful death claims). We can

---

**6.** Although the record does not contain the complaint the Olbins filed in their wrongful death action, the attorney representing them stated in an affidavit that "recoveries [made] on behalf of the Olbins have been for ... loss of consortium," and that the complaint against Pima County alleged "a similar theory." *See Southern Pac. Transp. Co. v. Lueck*, 111 Ariz. 560, 535 P.2d 599 (1975) (claim for non-economic damages in a wrongful death action are in the nature of loss of consortium, affection, companionship, personal anguish, sorrow, suffering, and pain and shock).

**7.** Although Rick Lingel could have come within § 12–612 as the personal representative of Erik's

estate had he filed his wrongful death action on behalf of the Olbins, he did not do so, but rather sued on his own behalf "individually and as surviving parent" of Erik, and for his own alleged damages.

**8.** "Maintenance" is defined as assisting another in litigation without a personal interest in its outcome. *Karp*. "Champerty" exists if there is an agreement that the person providing litigation assistance will share in the proceeds of the litigation. *Id.* For a more detailed explanation, see the special concurrence of Judge Brammer, *infra*, ¶ 31.

**254**

see no reason for treating wrongful death claims differently than those arising from personal injury for purposes of assignability. As the trial court noted, where severe injury is involved, "the distinction between what constitutes a wrongful death and a personal injury claim is often fortuitous." *See Howard Frank, M.D., P.C. v. Superior Court,* 150 Ariz. 228, 722 P.2d 955 (1986). Indeed, our supreme court has drawn no distinctions between such claims when dealing with their assignability in a different, but analogous, context. *See Chevron Chem. Co. v. Superior Court,* 131 Ariz. 431, 436, 641 P.2d 1275, 1280 (1982) (applying common law prohibition to separate workers' compensation actions involving both personal injury and wrongful death claims consolidated for appeal, stating "decisions from this court . . . have indicated that assignment[s] of tort or negligence claims, absent legislation to the contrary, are invalid"). Other jurisdictions have specifically held that wrongful death claims may not be assigned. *See Liberty Mut. Ins. Co. v. Lockwood Greene Engineers, Inc.,* 273 Ala. 403, 140 So.2d 821 (1962); *Mayo; Clar; Totten v. Parker,* 428 S.W.2d 231 (Ky.1967); *Jensen; Reese v. Preferred Risk Mut. Ins. Co.,* 457 S.W.2d 205 (Mo.App.1970). Thus, for these reasons and those enunciated above, we conclude that causes of action for wrongful death are not "freely assignable."

## Assignment of Proceeds

¶ 12 The Lingels next contend the underlying concerns and policy reasons for the prohibition against the assignment of personal injury or wrongful death actions are not implicated by agreements to share any proceeds from these actions because such agreements are not "assignments" for purposes of the rule. In *Karp,* under a somewhat similar factual setting, Division One of this court extended the rule prohibiting the assignment of personal injury actions to an assignment of anticipated proceeds from such an action. The court found the public policy reasons for and legal principles underlying the prohibition against the assignment of personal injury claims equally applicable to the assignment of the proceeds of such claims. Citing our supreme court's decision in *Allstate,* the court in *Karp* found no mean-

ingful distinction between the assignment of a claim and the assignment of the proceeds resulting from a claim.

¶ 13 The Lingels insist *Karp* is distinguishable, arguing that their agreement with the Olbins was not actually an assignment because an assignment effects an absolute transfer of "all rights in the property assigned" and creates an enforceable interest in the assignee, citing case law from various jurisdictions and 6A C.J.S. *Assignments* § 105 (1975). They thus maintain that because "the Olbins retained ownership and control of the wrongful death action," the Lingels had no enforceable right in it. Although this may be true, it is not a meaningful distinction. As evidenced by their present action, the Lingels do seek to enforce a putative interest in the wrongful death proceeds, although not in the litigation itself. But under this argument, any assignment of a personal injury action could be labeled "an agreement to share proceeds" and thereby sidestep the rule prohibiting such transactions. In *Allstate* our supreme court said: "It is clear that Allstate intended . . . to create a legally enforceable interest in any claim that their insured might have against a third party tortfeasor. By whatever name, this is an assignment of the insured's cause of action for personal injury against said third party tortfeasor." 118 Ariz. at 304, 576 P.2d at 492.

¶ 14 The Lingels further argue that *Karp* is inapplicable because it did not involve a statutory claim and its holding is contrary to the supreme court case of *State Farm Mutual Insurance Co. v. St. Joseph's Hospital,* 107 Ariz. 498, 489 P.2d 837 (1971). As noted above, that a cause of action is statutory is not necessarily determinative of its assignability. Moreover, the agreement at issue in *St. Joseph's Hospital* provided that the injured party, in consideration of medical care provided by the hospital, authorized her attorney to pay the hospital what she owed it by deducting that amount from any payment she might receive as a result of any judgment or settlement. The court found that the agreement was not an assignment of the injured party's personal injury cause of action "in whole or in part," but only allowed

her attorney "to act as a collecting agent" for those who had provided her medical care. 107 Ariz. at 503, 489 P.2d at 842. Although we see little contradiction between *St. Joseph's Hospital* and *Karp*, to the extent they may be inconsistent, we need not resolve that issue because the Lingels, unlike the plaintiffs in *St. Joseph's Hospital*, are asserting a direct interest in the proceeds of the Olbins' claims.[9]

¶ 15 Furthermore, the Lingels' argument fails to adequately address the holdings in *Brockman v. Metropolitan Life Insurance Co.*, 125 Ariz. 246, 609 P.2d 61 (1980), and *Allstate*, both decided after *St. Joseph's Hospital*, and the latter of which the court relied on in *Karp*. In *Brockman*, the supreme court concluded that an agreement labeled by the insurer as a "compromise and settlement" was actually an assignment of proceeds of a personal injury claim and was therefore unenforceable. The Lingels argue that this holding was "unreasoned" and should be applied only to prevent insurance companies from recouping benefits from personal injury plaintiffs. But the court did not so limit its holding, and, as noted in *Karp*, the public policy reasons and legal principles underlying the prohibition against assignments are not supported solely by insurance considerations.

¶ 16 Moreover, our supreme court had already explained its reasoning in *Allstate*. There, the assignee had argued that its interest in proceeds was not from an assignment of a cause of action for personal injuries because that interest would not arise until the assignor's personal injury claim had been reduced to a judgment or a settlement. The supreme court rejected that theory, stating simply, "We do not believe that this is a meaningful distinction." 118 Ariz. at 304, 576 P.2d at 492; *see Harvey v. Cleman*, 65 Wash.2d 853, 400 P.2d 87, 90 (1965) (rejecting same argument and finding it " 'a distinction without a difference' "), *quoting Gross-*

man *v. Schlosser*, 39 Misc.2d 473, 240 N.Y.S.2d 854, 855 (1963), *rev'd*, 19 A.D.2d 893, 244 N.Y.S.2d 749 (1963); *see also Southern Farm Bureau Cas. Ins. Co. v. Wright Oil Co.*, 248 Ark. 803, 454 S.W.2d 69, 72 (1970) ("no sound basis" for distinguishing between personal injury cause of action and its proceeds for purposes of assignability); *North Carolina Baptist Hosp., Inc. v. Mitchell*, 88 N.C.App. 263, 362 S.E.2d 841, 843 (1987) (distinction between assigning personal injury claim and its proceeds "is a mere fiction").

¶ 17 Finally, the Lingels maintain that the public policy reasons behind the prohibition of assignments of personal injury actions are inapplicable to assignments of proceeds, citing *Achrem v. Expressway Plaza Limited Partnership*, 112 Nev. 737, 917 P.2d 447 (1996). In that case, the Nevada Supreme Court concluded that the personal injury plaintiffs' assignment of a portion of their settlement proceeds did not violate the public policy against assigning tort actions because they had retained control of their lawsuit without interference from the assignee. Although an assignment of proceeds may lessen the danger that an assignee will interfere with and control a personal injury action, as the courts in both *Karp* and *Harleysville* noted, Nevada law on this subject is not persuasive; Nevada, unlike Arizona, permits the assignment of such actions. *See* 1979 Nev. Stat., ch. 305, § 2 at 458–59 (deleting statutory prohibition against assignments of tort claims from Nev.Rev.Stat. § 41.100(3)). More importantly, reasoning similar to that in *Achrem* was rejected by our supreme court in *Allstate* and by Division One of this court in *Karp*.

¶ 18 At issue in *Karp* was the Speizers' agreement to pay a portion of an anticipated accident recovery for a debt they owed the Karps. The court found "the public policy reasons and legal principles underlying the general rule prohibiting the assignment of a

---

9. In a related argument, the Lingels contend the trial court's ruling was overly broad and would vitiate any contingent fee agreements between personal injury plaintiffs and their attorneys or agreements for payment of medical bills between such plaintiffs and their care providers. Although a similar concern about contingent fee agreements was examined and rejected in *Har-*

*leysville*, no such agreements or issues are before us, nor were they before the trial court; therefore, we do not address those hypothetical cases. *See also Gartin v. St. Joseph's Hosp. and Med. Ctr.*, 156 Ariz. 32, 749 P.2d 941 (App.1988) (wrongful death proceeds not subject to health care provider liens).

claim for personal injuries ... to be equally applicable to [an assignment of its proceeds]." *Karp*, 132 Ariz. at 602, 647 P.2d at 1200; *see also North Carolina Baptist Hosp.* (assignment of proceeds of personal injury action invalid as contrary to public policy). We are not persuaded by the Lingels' argument that public policy concerns about maintenance and champerty do not apply when "the stranger does not acquire any right to control the litigation." Indeed, they appear to be implicated here. The record reflects that, only three days after the death of their only child, the Olbins entered into the agreement with the Lingels to share equally in Erik's estate and any proceeds from any wrongful death claims, at a time when both parties were suffering severe emotional distress. The Olbins allegedly did so under the guidance of an attorney who was a friend of the Lingels. The Olbins were clearly the only parties with rights to any proceeds from Erik's estate or death. Nonetheless, Rick Lingel filed a wrongful death complaint in his own name, albeit with the Olbins' allegedly uninformed consent, despite the fact that he was a legal "stranger" to the litigation, as well as to the Olbins and Erik. As the Lingels themselves point out, "maintenance" is defined as " 'intermeddling by a non-party in a suit which in no way belongs to such person, by maintaining or assisting either party, with money or otherwise, to prosecute or defend it,' " quoting *Black's Law Dictionary* 119 (5th ed.1983). In so noting, we do not attribute or imply any improper motives on the part of the Lingels. Moreover, even had Rick not attempted to involve himself in the claims and litigation relating to Erik's death, the prohibition and underlying public policy are prophylactic in nature. As the court in *Wilson* observed in invalidating an agreement to repay a loan from a close friend with a percentage of a wrongful death recovery,

> "It matters not that any particular contract is free from any taint or fraud, oppression, or corruption.... The law looks to the general tendency of such agreements, and it closes the door to temptation, by refusing them recognition in any courts of the country. It is enough that the contract belongs to a class which has a tendency contrary to public good."

688 So.2d at 270, *quoting Sampliner v. Motion Picture Patents Co.*, 255 F. 242, 251–52 (2d Cir.1918), *rev'd on other grounds*, 254 U.S. 233, 41 S.Ct. 79, 65 L.Ed. 240 (1920). Accordingly, we conclude the trial court did not err in finding the wrongful death proceeds at issue here unassignable.

### Underinsured Motorist Benefits

¶ 19 Lastly, the Lingels challenge the trial court's ruling that the UIM proceeds from the automobile insurance policy they had purchased were likewise subject to the rule of nonassignability, pointing out that contract claims are freely assignable. Their argument, however, ignores the fact that these proceeds were paid as a result of Erik's death and the tortfeasor's inability to fully compensate the Olbins for their loss. That is, the UIM proceeds were used to pay the Olbins' wrongful death claim, and as such, were not assignable. *See* A.R.S. § 20–259.01(B), (G) (underinsured motorist benefits payable only upon "bodily injury or death"); *Brockman* (regardless of label, assignments of personal injury actions or the proceeds therefrom are not valid); *Allstate* (same); *cf.* § 20–259.01(K) (abrogating common law prohibition against assigning causes of action for personal injury only to the extent provided in § 20–259.01(I)). As the Olbins point out, almost all payments for personal injury or wrongful death are made by insurance companies; the nonassignability rule and its underlying public policy would be eviscerated by such an exception.

### Conclusion

¶ 20 In view of Arizona's judicial precedents and public policy underlying the prohibition against assignment of personal injury causes of action, as well as case law from other jurisdictions on both sides of the issue, we conclude that the trial court properly determined that the parties' agreement was void and unenforceable as to wrongful death proceeds, regardless of their source. Although the Lingels present some salient reasons for dispensing with that prohibition, absent legislation to the contrary we are constrained to defer to our existing jurisprudence, as was the trial court.

¶ 21 The trial court's judgment in favor of the Olbins is affirmed.

CONCURRING: JOSEPH W. HOWARD, Presiding Judge.

BRAMMER, Judge, specially concurring.

¶ 22 Although I concur with the majority that there is no principled distinction between the assignment of personal injury and wrongful death causes of action and the assignment of proceeds that may result from prosecuting those actions, I write separately to express my confusion about, and ultimate disagreement with, the underlying rationale prohibiting the assignment of proceeds from either type of action.

¶ 23 In 1955, the Arizona legislature permitted the survival of personal injury claims under former A.R.S. § 14-477.[10] The genesis of the rule prohibiting the assignment of a personal injury cause of action appears to be dicta offered over thirty years ago in *Harleysville.* The court began its analysis by citing three pre–1955 decisions[11] as precedent and observed that, prior to the 1955 statutory enactment, "Arizona courts adhered to the generally accepted rule that rights of action for torts causing injuries which are strictly personal do not survive, and may not be assigned prior to the verdict or judgment." 2 Ariz.App. at 540, 410 P.2d at 497.

¶ 24 Of course, *Harleysville* was concerned with the state of the law after the enactment of the 1955 survival statute, so the court could hardly ground its decision on the pre–1955 cases applying different law. The court found authority on all sides of the issue and, after citing Arizona cases as support for the pre–1955 rule, turned to two 1965 cases from Missouri and Washington[12] for support in fashioning the post–1955 rule it announced: "We feel and therefore hold, that the better reasoned rule is that even though a cause of action for personal injury may survive, an action still may not be assignable either in whole or in part prior to judgment." *Id.* at 541, 410 P.2d at 498.

¶ 25 I find this statement far broader than was necessary to decide the case because the only issue the court recognized it must decide was "whether ... 14-477 A.R.S., allows an injured party to assign a portion of his recovery for personal injury to reimburse his insurance carrier for payments made to him under the provisions of the medical-pay portion of his insurance policy." *Id.* at 539, 410 P.2d at 496. One may surmise that the court, concerned that the insured would not otherwise receive the benefit of his contractual bargain with the insurer, found this result the better way to protect him from an overreaching insurer. *Harleysville*'s progeny, as the majority recognizes, has addressed similar attempts by insurers to deprive their insureds of the benefits their premium dollars purchased, uniformly protecting the insured against the insurer.

¶ 26 The court in *Travelers Indemnity Co. v. Chumbley,* 394 S.W.2d 418 (Mo.App.1965), relying on a long line of Missouri authority holding personal injury causes of action non-

---

**10.** Renumbered as § 14–3110 by 1973 Ariz. Sess. Laws, ch. 75, § 17. *See supra* ¶ 7.

**11.** Although all three cases the court in *Harleysville* cited support the pre–1955 nonassignability of nonsurviving claims rule, only *Employers Casualty Co. v. Moore,* 60 Ariz. 544, 142 P.2d 414 (1943), can be said to have tangentially dealt with the assignment of a personal injury claim. There, the plaintiff's former counsel sued the tortfeasor's insurer to obtain a fee after the insurer settled with the plaintiff without the knowledge of counsel, conduct counsel claimed was fraudulent. In reversing the trial court's fee award to counsel, the court said that the contingency fee agreement by which the client had "assigned" to counsel, as a fee, a percentage of any recovery obtained could not support counsel's claim against the insurer because the

client's claim could not survive and could not therefore be assigned.

The other two cases cited in *Harleysville* discussed the assignability of commercial claims based upon their survivability, and both found the claims were assignable. *See United Verde Extension Mining Co. v. Ralston,* 37 Ariz. 554, 296 P. 262 (1931); *Deatsch v. Fairfield,* 27 Ariz. 387, 233 P. 887 (1925). *Moore* cited both *Ralston* and *Deatsch* with approval as supporting the assignability-based-on-survivability rule, although neither case involved a personal injury claim, and neither found the claim at bench nonassignable.

**12.** *Travelers Indem. Co. v. Chumbley,* 394 S.W.2d 418 (Mo.App.1965); *Harvey v. Cleman,* 65 Wash.2d 853, 400 P.2d 87 (1965).

assignable, found invalid an insurer's assertion that, by settling his personal injury action with the tortfeasor without regard to the insurer's payment of medical expenses, the insured had assigned a portion of the proceeds to the insurer. The court found that the settlement had not affected the insurer's subrogation rights. *Harleysville*'s reliance on this authority to support its conclusion that the better rule was one of nonassignability of personal injury claims, despite their survivability, appears ill-founded because the court in *Chumbley* did not discuss the survivability of the cause of action. Indeed, of all the cases *Chumbley* cited in a footnote to support its decision, only *Beechwood v. Joplin–Pittsburg Railway Co.*, 173 Mo.App. 371, 158 S.W. 868 (1913), despite the existence of a statute appearing to provide for the survival of personal injury causes of action, held that a bankruptcy trustee could not substitute for and prosecute a bankrupt's personal injury claim.

¶ 27 After first finding no legal distinction between an assignment of a personal injury cause of action and an assignment of the proceeds flowing from such an action, the court in *Harvey v. Cleman*, 65 Wash.2d 853, 400 P.2d 87 (1965), held invalid a claim assignment to a personal representative that included elements of damage precluded by statute from surviving, despite the statutory survival of other damage elements.[13] Relying on *Chumbley*, as well as *Harvey*, which in turn referred to the Restatement of Contracts § 547 (1932), the court in *Harleysville* determined that, although historically the justification for the nonassignability of a "personal injury claim [has] been based mostly on the non-survivability of the cause of action, we believe that the non-assignability rule standing alone has much support in public policy." 2 Ariz.App. at 542, 410 P.2d at 499. The "nonassignability rule" to which

*Harleysville* referred and on which it relied was found in § 547 of the Restatement of Contracts and read:

WHEN AN ASSIGNMENT OF A CLAIM OR BARGAIN TO ASSIGN IT IS ILLEGAL.

(1) An assignment of a claim against a third person or a bargain to assign such a claim is illegal and ineffective if the claim is for

. . . .

(d) damages for an injury the gist of which is to the person rather than to property, unless the claim has been reduced to judgment.[14]

¶ 28 In order to find that an injured person could not assign a portion of any recovery prior to judgment, the *Harleysville* court was required to first support its conclusion that personal injury causes of action were nonassignable. Having reached that conclusion, however, it is even more interesting to note the court's final pronouncement that "nothing herein should be construed to prevent an assignment of all or part of a claim for personal injuries which has been reduced to judgment or otherwise liquidated." 2 Ariz. App. at 543, 410 P.2d at 500. Of course, the judgment or settlement terminates the claim, so nothing would remain to be assigned except the proceeds of the judgment or settlement. This leads me to conclude that the court in *Harleysville*, this state's seminal case on the assignability of personal injury causes of action, not only need not have concluded that such actions were not assignable, but needed only to narrowly construe the rights of the insured and his insurer, pursuant to § 14–477 and their insurance contract, to that portion of the insured's personal injury recovery necessary to repay the insurer. When the court extended its decision far beyond what was necessary to decide the narrow issue before it, in an area of the law

13. The statute on which the court relied, Wash. Rev.Code § 4.20.046, was amended in 1993 to permit the survival of the damage elements that did not survive at the time *Harvey* was decided. *See Tait v. Wahl*, 97 Wash.App. 765, 987 P.2d 127 (1999).

14. Curiously, § 547 was omitted from the Restatement (Second) of Contracts (1981), without any apparent indication why. The provisions in the Restatement (Second) pertaining to assignment apply only to contractual rights. *See* § 316. The only apparent reference to the assignment of personal injury claims is in comment c to § 317 (historic rule that cause of action cannot be assigned remains applicable to "claims for damages for personal injury"). The Reporter's Note contains no citations, to cases or otherwise, supporting comment c.

that is not only confusing but peppered with conflicting decisions from several jurisdictions,[15] our jurisprudence was started on a rocky and difficult path.

¶ 29 That is demonstrated in *Allstate,* where our supreme court held an automobile insurance policy provision requiring the insured to repay the insurer any medical expenses it had paid from the proceeds of any recovery the insured obtained "unenforceable as an assignment of the insured's cause of action against the third party tortfeasor." 118 Ariz. at 304, 576 P.2d at 492. The court noted that, although the provision did not expressly attempt to assign the cause of action to the insurer, that was the practical result. Accordingly, the court said, "Whatever the form, whatever the label, whatever the theory, the result is the same. Such an arrangement . . . is the legal equivalent of an assignment and therefore unenforceable." *Id.* The court noted that this conclusion was consistent with its earlier determination in *State Farm Fire & Casualty Co. v. Knapp,* 107 Ariz. 184, 484 P.2d 180 (1971), that an automobile insurance policy provision subrogating the insurer to the rights of the insured for any medical payments made on the insured's behalf "amount[ed] to an assignment and . . . a claim for personal injuries is not assignable." *Allstate,* 118 Ariz. at 303, 576 P.2d at 491.

¶ 30 The essence of the holdings in *Knapp* and *Allstate* has continued with the supreme court's decision in *Brockman* and with Division One's decision in *Karp.* Both continue the prohibition against the assignment of personal injury recovery proceeds. All, however, are grounded in the principles first announced in *Harleysville.*

¶ 31 Although the court in *Harleysville* referred to many valid reasons why some courts and commentators have concluded that assigning personal injury causes of action should be prohibited, it never used or relied upon the traditional common law words "maintenance," "champerty," or "barratry" in its analysis. These concepts may be simply summarized as follows:

The most common kinds of impermissible maintenance involve financial assistance. Champerty is simply a specialized form of maintenance in which the person assisting another's litigation becomes an interested investor because of a promise by the assisted person to repay the investor with a share of any recovery. Barratry is adjudicative cheerleading—urging others, frequently, to quarrels and suits. All were thought to lead to a corruption of justice because of their tendency to encourage unwanted and unmeritorious litigation, inflated damages, suppressed evidence, and suborned perjury. Those, of course, are the same arguments that have traditionally been made against other aids to impecunious litigants, such as free legal services and the contingent fee.

Charles W. Wolfram, *Modern Legal Ethics* § 8.13, at 489–90 (1986) (footnotes omitted). Wolfram continued: "Ancient court procedures and criminal laws directed at perjury, official corruption, and obstructing justice were seriously defective[, b]ut modern penal codes, and modern procedure and evidence law, contain sufficiently articulated devices to pursue those goals." *Id.* at 490. I am not so sanguine as he that better protection is now afforded by the complex tangle of current laws and advanced litigation techniques and, indeed, *Karp* acknowledged the same problems.

¶ 32 Accordingly, I have no quarrel with preventing trafficking in personal injury or wrongful death causes of action, as I am persuaded that such could reasonably lead to the evils Wolfram described and *Karp* and the majority acknowledged, even though the concepts in today's legal structure may be a bit archaic. Therefore, I do not presently argue for eliminating this prohibition. What troubles me is the second part of the equation, that which *Harleysville* articulated, and which *Brockman, Allstate, Knapp,* and *Karp* have perpetuated. That is the prohibition against prejudgment agreements to share, for any reason, proceeds resulting from the successful prosecution of personal injury and

---

15. *See, e.g., Graffagnino v. Fibreboard Corp.,* 781 F.2d 1111 (5th Cir.1986); *In re Musser,* 24 B.R. 913 (W.D.Va.1982); *In re Thompson's Estate,* 36 Misc.2d 638, 231 N.Y.S.2d 718 (1962); *In re Behm's Estate,* 117 Utah 151, 213 P.2d 657 (1950).

**260**

wrongful death actions. If this concept was ever valid,· it appears to have little, if any, currency and should be revisited and abandoned by our supreme court.

¶ 33 A paternalistic undercurrent runs through many of the cases espousing and repeating the non-assignability rule, as their results protect people in difficult circumstances [16] by restricting their ability to assign all or a portion of a contingent asset, an unliquidated claim for damages. I understand and agree with the policy reasons these courts have relied on to prevent trafficking in unliquidated claims by strangers to those claims. Additionally, it is doubtless true that people enduring extreme personal tragedy, as were the Olbins here, whether because of the death of a loved one or because of a calamity causing them injury, are perhaps less able to manage their property and affairs than those not encumbered by similar suffering. This inability would, however, seem to me to apply equally to that person's capacity to manage all or any part of his or her assets, not just the proceeds of litigation resulting from the injury or death. Is it any less difficult to handle commercial transactions concerning one's job, home, automobile, family heirloom, beloved pet, securities, stamp collection, or any other possession or asset than it is the proceeds of a personal injury or wrongful death claim so as to require governmental protection precluding alienation of any portion of the latter? I think not, and suggest we must recognize that competent people who are otherwise free to borrow against or give away everything they own or to sell their assets at market value or for pennies on the dollar should also be able to freely sell, give away, or borrow against proceeds that may result from the successful prosecution of a personal injury or wrongful death action unencumbered by the outdated rules we follow today.

¶ 34 Because I see the potential for mischief in the absolute assignment of these causes of action, I would draw a line, admittedly fine, between that type of assignment and the assignment of their proceeds. Ac-

quiring an interest in proceeds should not give the acquiring party any interest in, or ability to direct, the litigation that may or may not result in those proceeds. Of course, clever counsel, heavy-handed "investors," and insurers may well craft documents that would bend or even cross this line. These concerns, however, are little, if any, different from current commercial arrangements between members of the general public and those lenders, investors, insurers, or "advisors" who now attempt to separate them from their assets by any means legal. These latter matters are addressed by the courts if legal bounds are exceeded and so, I trust, in similar circumstances, would the former.

¶ 35 For the same reason I find no principled distinction between precluding the assignment of personal injury or wrongful death causes of action, I cannot differentiate between selling or borrowing against one's tangible assets and sharing the proceeds of those actions, whether by sale, encumbrance, or gift. Despite finding little reason to support the extant rule precluding such sharing, particularly because evolving jurisprudence has seriously and significantly eroded *Harleysville*'s already fragile foundation, I nevertheless feel compelled to follow that rule until it is modified, and therefore concur with the majority in the result.

---

**16.** The cases almost uniformly also protect those in unequal bargaining positions, specifically in-

sureds against their insurers.